## PLEASANT PLACE, INC. ET AL. *v.*
## LEVINSON ET AL.

[No. 153, September Term, 1970.]

*Decided January 6, 1971.*

The cause was argued before HAMMOND, C. J., and McWILLIAMS, FINAN, SINGLEY, SMITH and DIGGES, JJ.

*Charles C. W. Atwater*, with whom were *Dwight C. Stone* and *Mylander & Atwater* on the brief for appellants.

*Melvin J. Sykes* for appellees.

SINGLEY, J., delivered the opinion of the Court.

It was perhaps an understatement when the trial court (Menchine, J.) characterized this as a "lengthy, somewhat complicated, contract action" which began when the seller sued the purchasers at law for damages for breach of a contract to purchase a partially completed apartment house.

Sometime in 1962, Pleasant Place, Inc., (Pleasant Place or the Seller), the creature of Nachman Gerber and his wife, Miriam (the Gerbers), undertook to construct a 13-story apartment building at 8 East Pleasant Street in Baltimore. Construction financing was obtained on the commitment of The Equitable Life Assurance Society (the Equitable) to make a mortgage loan of $600,000 secured by a first deed of trust. The project was ill-starred from the outset, however. The construction schedule fell behind; subcontractors were not being paid and began to assert mechanics' liens; the general contractor became insolvent, and ultimately, the Gerbers had another of their corporations continue the work.

The Gerbers, finding themselves short of funds, ar-

ranged to borrow $125,000 from Real Estate Capital Corporation (Real Estate Capital), whose president was one Samuel M. Fox. This borrowing was evidenced by the note of Pleasant Place, dated 3 December 1963. The note, which provided for interest at 12% and called for 60 monthly payments of $1,793.37 each, commencing 3 January 1964, with the balance payable 3 December 1968, was secured by a second deed of trust on the apartment building. Payment of principal of and interest on the note was personally guaranteed by the Gerbers.

By the spring of 1964, the Gerbers had lost much of their enthusiasm for the project. The building was not entirely complete and was attracting tenants slowly. The Gerbers' personal liability on the construction loan had been released when the first deed of trust had been assigned to the Equitable in January, but the Gerbers were concerned about their personal liability on the loan from Real Estate Capital. Fox, the president of Real Estate Capital, was equally concerned about the loan he had made. Together, they decided to look for a purchaser for the apartment house.

Jack Levinson, his brother and two cousins, who were also brothers (the Levinsons or the Buyers), appeared on the scene. In due course, after some weeks of negotiations, a contract was prepared by the Levinsons' counsel and signed by the parties on 8 June 1964. Although the contract was between Pleasant Place as Seller, and the Levinsons as Buyers, Fox, as trustee, and Real Estate Capital as beneficiary of the second trust were joined as parties, for reasons which will be developed.

The contract had several novel features. The first was that it called for settlement on or before 10 June, two days after it was signed. Another was that Real Estate Capital agreed to lend Pleasant Place an additional sum of $10,000, to be secured by a third deed of trust to be executed at the closing. The Buyers would then take title subject to the first trust held by Equitable, and the second and third trusts, held by Real Estate Capital. As a condition precedent to the Buyers' bargain, the Equita-

ble's notes were to be modified to provide that only interest would be payable quarterly for one year from the date of closing, and that thereafter principal and interest would be paid in quarterly installments of $12,330 (the same quarterly payments as had been stipulated prior to the proposed one year moratorium) until the debt was repaid in full.

The contract also provided that the note held by Real Estate Capital evidencing the indebtedness secured by the second trust was to be modified to reduce the interest rate from 12% to 9%; to provide that only interest would be paid for a year following the closing, and that thereafter, monthly installments of $1,123.75 would be paid, with a final maturity eight years from the closing. The deed of trust securing the Real Estate Capital note was also to be modified by deleting a provision which increased amortization payments in the event of an increase in real estate taxes. The Buyers were to be relieved of any personal liability on the notes secured by the second and third deeds of trust after payments in reduction of principal had aggregated $20,000. Hovering somewhere off stage, but not stipulated in the contract or known to the Buyers, according to their testimony, was the idea that the Gerbers, once the sale had been made, would be absolved by Fox from liability on their guaranty of the loan from Real Estate Capital.

It will be recalled that the contract of sale was dated 8 June 1964. Paragraph 6 provided that closing was to be had on or before 10 June, at which time the Seller was to produce, among other documents:

> "(a) Certificate or letter from the Building Engineer of Baltimore City that any and all violations or defects in said building have been fully corrected and remedied.
>
> (b) All drawings, plans, specifications, as well as details of drawings of the electrical and plumbing work and installations, all warranties and guarantees pertaining to the roof, building and any and all heating, refrigeration and other

fixtures and appliances installed and used upon or in connection with the premises.

(c) A full and complete inventory of all fixtures and appliances and other chattels located upon the premises and owned by Seller.

(d) All permits and licenses of every nature which shall be assigned to the Buyers."

The last numbered paragraph of the contract provided:

"All representations and warranties made or contained herein and any terms and conditions contained herein which have not been performed or carried out by any of the parties hereto at the time of closing or which are to be performed or carried out after the closing hereunder shall survive the said closing."

On 10 June, the date fixed for settlement by the contract, Mr. Fox went to the office of Emanuel Gorfine, Esq., counsel for the Levinsons, and presented a draft of a guaranty agreement, which was intended to reflect the provisions of the contract of sale respecting the second and third deeds of trust. The draft contained three paragraphs which were unacceptable to Gorfine, who believed that they enlarged the scope of the obligation which the Levinsons had agreed to assume in the contract of sale since the contract explicitly provided that the Buyers were not to be personally liable in the event of a default on any of the deeds of trust after the payment of $20,000 on the second and third deeds of trust. Quoted below are the paragraphs which Mr. Gorfine found unacceptable:

"NOW, THEREFORE, in consideration of the premises, mutual covenants, obligations, and of other good and valuable considerations, receipt of all of which is acknowledged, the aforesaid First Parties [the Buyers] jointly and severally, do hereby guarantee unto Second Party [Real Estate Capital] the payment of Twenty Thousand ($20,000.00), to be applied against the principal debts of the Notes secured by the afore-

said Second and third Deeds of Trust, provided, however, that if the aforesaid monthly payments of $1,123.25 on said Second Deed of Trust, and $89.90 on the aforesaid third Deed of Trust are each paid when due, and without default, then the obligation of this Guarantee shall be void and of no effect when the sum total of payments against the principal of the aforesaid Notes securing the Second and Third Deeds of Trust total in the aggregate $20,000.00;

"Except, however, it is further provided that said Guarantee shall remain and continue in full force and effect unless, at the time the principal payments thereunder total $20,000.00, there shall be no default or failure to perform any of the obligations, covenants or agreements contained in the aforesaid First, Second and Third Deeds of Trust,

"And provided further, that it is hereby agreed and covenanted by the First Parties [the Buyers] that they will pay in full for all obligations incurred by them during their ownership of *and with respect to* [1] the property, including accruals of unpaid taxes and interest to the First, Second and Third Deeds of Trust to the date of sale, or other disposition of property by them."

When Fox declined to retreat from his position, Gorfine called off the settlement. Later on the day of 10 June, Fox changed his mind, and settlement was rescheduled for 15 June. When the Levinsons announced that adjustments would have to be made as of 15 June instead of 10 June, it was then Gerber who balked, but ultimately capitulated.

Early on the morning of 15 June, in anticipation of the closing, the Levinsons visited the property and deter-

---

1. The italicized phrase was a handwritten insertion.

mined that the air conditioning system had not been completely connected, and was inoperable. Later in the day, the parties met at the office of Monumental Title Company, which was to issue the title policy, and an argument commenced, which went on and on. The controversy revolved around four points:

(i) The contract provided that the Seller would produce at settlement a "certificate or letter from the Building Engineer of Baltimore City that any and all violations or defects in said building have been fully corrected and remedied." It is abundantly clear that there were such violations, albeit minor ones, and that the Seller had no such certificate or letter on 15 June.

(ii) The situation with respect to the air conditioning. Gerber said that the system could be completed at a cost of $1,250, which he wanted the Levinsons to pay, and offered to be responsible for any cost in excess of this figure. This was rejected by the Levinsons, who viewed it as an effort to increase the purchase price, although the contract of sale was clearly for the sale of a building which was in an unfinished condition.

(iii) The failure of the Seller to produce a roof guaranty which the Levinsons demanded under the contract provision that they were to be furnished with all warranties and guarantees pertaining to the roof.

(iv) The Seller's failure to produce plans and specifications in a form approved by the City's Building Engineer, which may not have been called for by the requirement that "all plans, drawings, specifications" be furnished.

It would appear that the argument which raged for nearly four hours over these items precluded a consideration of two much more serious problems. The sales contract imposed upon the Seller the duty of modifying the

notes held by the Equitable so that interest only would be payable in quarterly installments for one year and that thereafter quarterly installments of $12,330 should be made until all principal and interest had been paid. On the afternoon of 15 June, Gerber had copies of teletypes and may have had a letter from the Equitable advising him that interest only would be payable for one year but that quarterly payments would be increased to $12,545 and that there would be no extension of the loan's 22 year maturity. Equitable had signed no formal documents, which Equitable expected the Seller to prepare. Gerber had with him the guaranty agreement which Mr. Gorfine had rejected on 10 June. The objectionable language had been stricken but the paper had not been signed by Fox or Real Estate Capital.

Gerber also had in his possession what appears to be an incomplete copy of the proposed third deed of trust submitted by Fox. The document introduced in evidence was one of five pages, without a signature page. As drawn, it provided that payments in amortization of principal would commence one month after closing, rather than a year after closing, as the contract of sale provided. Mr. Gorfine testified that he had not seen it because "We never got to that point * * * on the day of the settlement" but that it "would never [have] been approved because that was not in accordance with the terms of the contract."

Mr. Gorfine left the settlement. He explained his position:

"* * * As I said before, it is difficult to portray now all of the things that transpired between the time of the signing of the contract and all of the discussions and discussions we had up to June 15th in any statement that I may make in connection with it. We all felt that Mr. Gerber, who had been insisting and saying that he would have everything ready on the 10th, which was not so, that he would have everything ready on

the 15th, which was not so, that this could go on interminably, and I didn't see any reason for prolonging it."

While the contract provided that time was of the essence, it was clear that Mr. Gorfine believed that it had been Gerber who was pressing for a prompt settlement, and not the Buyers. A month after the collapse of the settlement, during which there had been an exchange of recriminatory letters, which never included a representation by the Seller that it was prepared to do more than to provide items (i), (iii) and (iv) and to adjust item (ii), Real Estate Capital foreclosed on its second trust, and a few months thereafter, the Equitable foreclosed.

Pleasant Place first sued the Levinsons for damages in the Circuit Court for Baltimore County in 1965. This case was non prossed in 1966, and in 1967, an appeal was taken to this Court from an order denying a motion to strike the judgment. Thereafter, the present action was filed, and we stayed the earlier appeal pending the outcome of this case. This action was based on three counts. In the first, Pleasant Place claimed damages of $300,000 for breach of contract. In a second count Pleasant Place sought damages in the same amount to the use of Mr. and Mrs. Gerber for damages which they had sustained in consequence of the breach. In a third count Mr. and Mrs. Gerber claimed special damages in the same amount. Before trial, the plaintiffs were permitted to amend the declaration, increasing the ad damnum by $100,000.

The case came on for trial before the circuit court, sitting without a jury, and was tried for four days. At the conclusion of testimony, the court, after discussing whether the damages which the Gerbers and Pleasant Place had suffered were reasonably foreseeable by the Buyers—a consideration which we need not reach under our view of the case—turned to a discussion of the problems relating to the air conditioning, the certificate of the Building Engineer, the guaranty for the roof, and concluded:

"Now, counsel for the plaintiffs suggest that all of those items are so minor in nature as to constitute matters about which there is no real concern and should be no real concern to anyone, that they, in short, fall within the rule announced in the cases that the Court has cited. This Court, however, does not see it that way. Seen in the light of the information available to Gorfine and to the Levinsons on the day of June the 15th, after the experiences of June 10th and the [sequellae] between the 10th and the 15th, the Court can only conclude that there was a reasonable justification and belief by the Levinsons that the sellers were not ready, willing and able to comply with the necessary and important requirements of the agreement. I think that although it did not come into the settlement as far as the testimony of the defendants' witnesses are concerned, it seems clear to the Court that there are other documents that were offered by the plaintiff in connection with the case that were obviously not in compliance with the terms of the contract. These were the questions of whether there was or was not compliance by Equitable in the terms of the contract with respect to its time of repayment, the contract calling for $12,330 a quarter, and the letter of Odebrecht [Equitable's local manager], if accepted, is the equivalent of what the contract calls for as to form, provided $12,545, I think, per quarter, but, more importantly, also, did not give the defendants the benefit of the full year of amortization that the contract called for beyond that which the letter of Odebrecht permitted, and, again, counsel offered the suggestion that this is a matter that is not important to the overall performance of the contract. Again, the Court does not agree that this is the case. The requirement that the Levinsons or their assigns, if they dis-

posed of the property afterwards, would be required at the end of a certain number of years to make a specific payment of $49,000 is hardly a matter about which it could be said that that is a matter of no importance. I am mindful, of course, that the contract settlement did not die in the office of Mr. Dixon [the title company's settlement officer] on that [account], but it is interesting, as it comes from the plaintiff in the course of the presentation of the case, that this is another document that does not comply with the terms of the contract, and, therefore, was in violation of it.

"And the same thing may be said with respect to the document that provided interest only on the Deed of Trust, the second Deed of Trust, whereas the document actually presented in this case as the one that was present for signature at the time required the payment of principal right from the beginning.

"In short, the Court concludes that, balancing all of the evidence in this case, the Court believes that the circumstances arising and existing on June 15th, 1964, in light of the circumstances and conditions that had preceded that appearance in the office of Monumental Title, were such as to persuade the mind of a reasonable man that the plaintiffs in this case were not in a position where they were ready, willing and able to perform the contract terms that they had undertaken to perform, and that, accordingly, the Levinsons were reasonably justified in leaving the place of settlement and concluding that there was a breach of the contract of June 8, 1964, by the other signatories to it. This is the conclusion that the Court has reached, and, accordingly, the verdict will be in favor of the defendants, and judgment will be entered on

the verdict in favor of the defendants for costs of these proceedings."

The appellants rely on a line of Maryland cases which hold that not every breach of contract will justify a rescission, but only a breach which goes to the root of the matter, relying on *Senick v. Lucas,* 234 Md. 373, 199 A. 2d 375 (1964); *Mayor & City Council of Baltimore v. Industrial Electronics, Inc.,* 230 Md. 224, 186 A. 2d 469 (1962); *Speed v. Bailey,* 153 Md. 655, 139 A. 534 (1927); *Ady v. Jenkins,* 133 Md. 36, 104 A. 178 (1918); *Koch v. Wimbrow,* 111 Md. 21, 73 A. 896 (1909). See also, Restatement, *Contracts* § 275 (1932); 6 *Williston on Contracts* § 842 at 165 (3d ed. 1962); and 3A *Corbin on Contracts* § 701 at 311 (1960).

But what is, or is not, substantial performance is a question of fact, to be determined by the trier of facts in the light of the circumstances of each case, *Evergreen Amusement Corp. v. Milstead,* 206 Md. 610, 621, 112 A. 2d 901 (1955); *Speed v. Bailey, supra,* 153 Md. at 661-62. Assuming, without deciding, that neither the Seller's inability to provide the Building Engineer's certificate, nor to furnish the plans and specifications stamped by the Building Engineer, nor to complete the air conditioning, nor to deliver the guaranty for the roof was a failure of substantial performance, we cannot brush aside so easily the Seller's inability to obtain a modification of the Equitable notes or to arrange for the additional financing from Real Estate Capital in the precise manner the contract of sale required. These were not undertakings subordinate to the purpose of the contract but rather ingredients essential to the financing of an acquisition which was, from the beginning, a highly speculative salvage operation, and were elements which went to the heart of the bargain. The Seller makes much of the fact that the Engineer's certificate, the plans and specifications, the air conditioning and the roof guaranty were details of little consequence in what it terms a $735,000 transaction. The bald facts are to the contrary, however. What the Buyers were attempting to do was to take over

the project on the cheap, at a minimum of personal risk, ultimately agreeing only to be personally responsible for payment of $20,000 on the second and third deeds of trust and for an immediate cash payment of $10,000 of a total of some $13,000 apparently owed by the Seller on appliances installed in the building. Viewed in this context, the Seller's failure to obtain modifications of the terms of the senior debt, as it had undertaken to do in the contract of sale, was a substantial breach for which the Buyers could not have been reasonably compensated in damages. In the context of the transaction, it went to the root of the contract, and might be compared to the situation in *Griffith v. Scheungrab*, 219 Md. 27, 146 A. 2d 864 (1958) where we denied a seller specific performance of a contract for the sale of real estate subject to F.H.A. financing when the seller had failed to deliver an appraisal certificate.

Additionally,

"When time is of the essence of a contract, it means that the performance by one party at the time, or within the period of time, specified in the contract is essential in order to enable him to require performance from the other party; it does not mean merely that time is a material matter, but that it is so material that a strict compliance in this respect is necessary to the right to require counter-performance. [citing cases]" *Cheston L. Eshelman Co. v. Friedberg*, 214 Md. 123, 133-34, 133 A. 2d 68 (1957).

Therefore, whether or not we assume, as the Levinsons argue that we should, that the doctrine of substantial performance is not applicable to a contract which provides that time shall be of the essence of the bargain, we cannot say that the lower court's findings that Pleasant Place was not ready, willing and able to perform the contract on 15 June and that the Levinsons were justified in concluding that there had been a breach by Pleasant Place and Fox were clearly erroneous, when viewed in the light

most favorable to the party prevailing below, Maryland Rule 886; *Burroughs International Co. v. Datronics Engineers, Inc.*, 254 Md. 327, 255 A. 2d 341 (1969).

The appellants make a point of the fact that in the cross-examination of Mr. Dixon, the settlement officer for the title company, counsel for the Buyers went beyond the scope of the direct examination, and is therefore bound by Dixon's testimony, citing *Lockhart v. State*, 145 Md. 602, 626, 125 A. 829 (1924). Assuming that they are correct, both sides seem to concede that such of the questions as went outside of the direct examination called for the interpretation of an unambiguous contract. Dixon's answers were conclusions of law, *Ebert v. Millers Mutual Fire Ins. Co.*, 220 Md. 602, 610, 155 A. 2d 484 (1959), which were not binding on the court.

Accordingly, the judgment in favor of the defendants for costs will be affirmed.

*Judgment affirmed, costs to be paid by appellants.*