# GERALD D. SCHACKOW v. MEDICAL-LEGAL CONSULTING SERVICE, INC.

[No. 1252, September Term, 1979.]

*Decided July 10, 1980.*

The cause was argued before THOMPSON, MOORE and MASON, JJ.

*Albert D. Brault,* with whom were *Brault, Graham, Scott & Brault* on the brief, for appellant.

*Oran R. Lewis, Jr.,* and *Richard B. Bland,* with whom were *Stephen A. Horvath, Lewis, Wilson, Lewis & Jones, Ltd.,* and *Landcaster, Bland, Eisele & Herring* on the brief, for appellee.

MOORE, J., delivered the opinion of the Court.

Appellant, Gerald D. Schackow, a member of the Florida Bar, was trial counsel for the successful plaintiff in a serious medical malpractice action tried before a jury in Gainesville, Florida in March 1977. Appellee, Medical-Legal Consulting Service, Inc., a Maryland corporation engaged in the business of providing consulting services to attorneys in the preparation of cases involving medico-legal issues, brought suit against appellant in the Circuit Court for Montgomery County to enforce payment of a ten percent contingent fee for services rendered in the case under a consulting agreement with attorney Schackow and his client. The total recovery in the malpractice action was 1.435 million dollars. The court below (Mitchell, J.) awarded judgment to the consulting firm in the sum of $130,351.25. We shall affirm.

I

The malpractice action had its genesis in Florida when John Judd Dixon, age 35, fell while waterskiing on June 5, 1974. Twelve days later, with symptoms of headaches, personality changes, and amnesia, Mr. Dixon went to his family physician, Dr. George Little. The latter prescribed Midrim and ordered a routine neurological examination for June 26, 1974. Two days before the examination, Mr. Dixon, suffering from the same but aggravated complaints, went to the emergency room of the North Florida Regional Hospital.

He was seen by Dr. Donald T. Quick, the neurologist with whom his routine examination had been scheduled. Dr. Quick admitted Mr. Dixon and arranged for a series of neurological tests.

On June 25, 1974, the day following Mr. Dixon's admission to the hospital, a skull x-ray and brain scan were performed. Dr. A. J. Dickhaus, a radiologist, interpreted the scan between 7:30 and 10:55 that very morning. It was the radiologist's opinion, based on the tests, that Mr. Dixon had a subdural hematoma — bleeding inside the skull beneath the dura mater, the outermost of three membranes covering the brain. The report and opinion were transmitted routinely to Dr. Quick.

Meanwhile, Mr. Dixon's condition was rapidly deteriorating. At 12:45 p.m. the pressure from the expanding hematoma caused a portion of the brain to herniate by protruding into a sinus cavity. An hour later Dr. Joseph Cauthen, a neurosurgeon, bored emergency and temporary burr holes to relieve the pressure. Subsequently, complete surgical procedures were employed to remove the hematoma. Due to the herniation of his brain, caused by delay in proper medical treatment, Mr. Dixon was rendered cortically blind and a quadriplegic. While a patient at the Veterans Administration Hospital in Gainesville, he was adjudged mentally incompetent by a Florida court, and his wife, Glenda Ann Dixon, was appointed as guardian. (At the time of the accident, Mr. Dixon held a Master's Degree in Business Administration and was a doctoral candidate at the University of Florida.)

(a) *The Contract with MLCS*

Mrs. Dixon consulted Gerald D. Schackow, Esq., the defendant in this case, with reference to a potential malpractice suit against the health care providers who treated her husband. Mr. Schackow agreed to accept the case. Although admitted to practice in 1966 and possessing substantial trial experience, he had never handled a medical malpractice suit and therefore embarked upon a search for

help in assembling a case against the physicians and the hospital. Another Florida attorney recommended the plaintiff, Medical-Legal Consulting Service, Inc. (MLCS), headquartered in Chevy Chase, Montgomery County. MLCS was described in the proceedings below as a consulting service designed to assist attorneys in preparing medically oriented litigation and in locating physicians willing to testify at trial; it essentially serves as an educator and conduit, bringing together attorneys and physicians and familiarizing them with the critical aspects of the case. MLCS determined, in a written "Preliminary Analysis" dated May 9, 1975, that Mr. Dixon's malpractice claim was meritorious. Thereafter, on May 20, 1975, a contract for assistance in the preparation of the case was entered into between MLCS, Schackow, and Glenda Dixon. Under the agreement MLCS would receive a percentage of the net recovery, on a graduated basis. Effectively, MLCS would be paid ten per cent if the recovery exceeded $1,000,000.00. MLCS undertook to "exert its best efforts and abilities" but made "no promises or guarantees regarding the outcome. . . ." Authorized expenses of the consultants as well as fees and expenses of experts were to be paid by Mrs. Dixon irrespective of the outcome.

(b) *Dixon v. Little, et al.*

A malpractice action was subsequently filed against Doctors Little, Quick, and Dickhaus, and North Florida Regional Hospital in the Circuit Court of Florida, Eighth Judicial Circuit In and For Alachua County. Mr. Schackow and MLCS began to prepare the malpractice action against the health care providers. The consultants were to assist counsel by helping them to understand the medical aspects of the case and locating qualified physicians willing to testify.

A search was begun for a neurologist to testify as an expert against Dr. Quick who, in the judgment of MLCS, was "80 per cent" responsible for Mr. Dixon's condition. Two neurologists were contacted by MLCS. Dr. Gunter R. Haase, chairman of the department of neurology at Pennsylvania Hospital in Philadelphia, received the pertinent medical

records, agreed to testify, and was deposed in April 1976. At the time of his deposition Dr. Haase indicated that he felt that there was possible malpractice in the handling of Mr. Dixon's treatment; however, he had not been given the depositions of Drs. Quick or Little.[1] Upon being furnished by MLCS with copies of those depositions some nine months later, Dr. Haase opined in a letter of February 23, 1977 to Mr. Schackow that "I am not too sure that I will be a good witness for you." He based this determination on a further review of the medical records and the depositions provided to him, and he concluded that "I will not be able to say that this was a clear case of malpractice. . . ." Dr. Haase was, of course, lost to the plaintiff as a potential expert witness.

MLCS also contacted Dr. Gerald F. Winkler, an eminent neurologist at Massachusetts General Hospital in Boston. He reviewed the case and agreed to testify for the plaintiff. It happened, however, that the trial date was set at a time — the only time in his schedule — when Dr. Winkler had a long-standing prior commitment. Although he offered to appear by way of videotaped deposition, Mr. Schackow ultimately decided that he would not be an appropriate witness for an Alachua County jury; he apparently also felt that the doctor's fee was too high. The videotaped deposition of Dr. Winkler was never taken.

Placed on notice that the two neurologists, who were expected to appear as plaintiff's expert witnesses, would be unable to do so, MLCS wrote to Mr. Schackow on February 1, 1977 that "we might be wise to allow these issues to lie for the time being and attempt to find a Florida neurologist who will speak to the issues. . . . [I]t's in the case's best interest to temporize." February 18, 1977 was the final day for the naming of experts for the impending trial.

On February 16th MLCS contacted Dr. Sharif Shafey, a Miami neurologist, who apparently agreed to peruse Mr. Dixon's records, which were delivered to him a day later. The

---

1. Each party attempted to assign to the other responsibility for the failure in sending the depositions. The trial court found: "It was not clear at the trial before this Court whether Mr. Schackow had neglected to send the transcript to MLCS or whether MLCS had received it but neglected to forward it to the doctor."

same day, February 16th, MLCS informed Mr. Schackow that they had contacted a "[s]uper board-certified neurologist from Miami willing to speak to issue." Mr. Schackow then listed Dr. Shafey as an expert witness for the plaintiff, but the doctor thereafter refused to be deposed or to participate in any manner, stating: "I have declined this case and I have not accepted to testify . . . on anybody's behalf." In reviewing the circumstances surrounding the abortive attempt to enlist Dr. Shafey as an expert the trial court was "persuaded that Mr. Militana [President of MLCS] told Mr. Schackow that Dr. Shafey would testify for the Dixons before the doctor had actually received the records, found malpractice, and agreed to testify." Plaintiff went to trial without the benefit of expert testimony from a neurologist.

Between February 12 and March 18, 1976, Mr. Schackow sent four letters to MLCS in which he requested MLCS to locate a radiologist to testify as an expert witness against Dr. Dickhaus. On March 23, 1976 Robert Militana, MLCS's president, stated in a letter to Mr. Schackow that "we are prepared to present your client's case to one of the best Neuro-Radiologists in the country who practices in the Washington, D. C. are [sic] and is willing to work with us and testify at the trial of this case." MLCS did not contact the radiologist until February 10, 1977, eleven months later. The radiologist was of the opinion that Dr. Dickhaus had not been negligent in handling Mr. Dixon's brain scan. No other radiologists were contacted by MLCS, and plaintiff went to trial without a radiologist to testify against Dr. Dickhaus.

No expert witnesses were found to testify against the hospital. The trial court stated in its opinion: "It could not . . . reasonably have been expected that MLCS would employ much time and effort in pursuing this aspect of the case, but there was no evidence that the Plaintiff ever asked any expert to consider the hospital's possible negligence." In a memorandum dated February 9, 1977 Mr. Schackow acknowledged that his case against the hospital was "poor." Nevertheless, he obtained a $35,000.00 settlement from the hospital prior to trial.

On March 14, 1977 Mr. Dixon's case went to trial against Doctors Little, Quick, and Dickhaus. Two Florida general practitioners, who had been located by MLCS, testified that Dr. Little violated the standard of care for general practitioners in Florida. At the close of plaintiff's case Doctors Quick and Dickhaus obtained directed verdicts in their favor because plaintiff had no experts to testify against them.[2] The jury returned a verdict against Dr. Little, the remaining defendant, in the amount of $1,500,000.00.

An appeal was noted by Dr. Little, but prior to the filing of briefs the parties settled for $1,400,000.00. The total recovery in the case was thus $1,435,000.00, and MLCS's ten per cent share of the net recovery, pursuant to its contract with Mrs. Dixon and Mr. Schackow, was $142,051.25.

Mr. Dixon was, as previously noted, incompetent, and Mr. Schackow filed a petition with the Florida court having jurisdiction over Mr. Dixon's guardianship for approval of the contingency fee contract. The contract, which was signed by the parties and approved by the court on May 20, 1977, included the representation: "The ten (10%) fee for MLCS will be paid from the attorney's fee, outlined above." The attorney's fee was to be 47.5% of the net recovery, representing a reduction from 50% originally negotiated in a contract signed on May 9, 1975.

### (c) Refusal to Pay Consultants

Mr. Schackow refused, however, to pay MLCS the fee set in the contract dated May 20, 1975. On September 9, 1977 MLCS filed a declaration in the Circuit Court for Montgomery County asking for its ten per cent fee plus interest and costs. Prior to the trial of the case Mrs. Dixon executed an assignment to Mr. Schackow of any "claims, demands and causes of action of whatsoever kind and nature . . ." that she may have had against MLCS. Mr. Schackow's primary defense to MLCS's action against him

---

2. In accord with Florida law and procedure, the court, upon Dr. Quick's motion to tax costs, entered a judgment for costs against the plaintiff in the doctor's favor for $16,753.31. This judgment was subsequently settled for $13,000.00.

was premised on alleged material breaches of contract that rendered MLCS's performance deficient. He averred that MLCS should be denied any recovery on the contract, contending that the recovery, if any, should be on the basis of *quantum meruit.*

After a five day trial, the court held the case *sub curia.* An extensive and well-reasoned Memorandum and Order was filed on July 16, 1979 in which the court found that MLCS had not fully performed its consulting agreement but that it had substantially performed. The court also found that the breaches by MLCS might have caused three general types of damages for which Mr. Schackow could be compensated: (1) failure to collect on the judgment because the verdict was against only one defendant; (2) additional expense and work incurred by Mr. Schackow to perform functions that should have been accomplished by MLCS; and (3) damages resulting from the directed verdicts in favor of the doctors and the resulting judgment for costs.

The court found that the evidence supported only the last category of damages, and therefore it reduced plaintiff's recovery by the appropriate amount. With regard to defendant's contention that the contract with MLCS was void as against public policy, the court found the contract valid. Judgment in the amount of $130,351.25 was entered in favor of the plaintiff; defendant took a timely appeal to this Court and assails the lower court's action on five grounds:

1. MLCS materially breached the contract;
2. The doctrine of substantial performance was erroneously applied;
3. The doctrine of *quantum meruit* should have been applied;
4. In awarding damages to Mr. Schackow, the court erred in its application of the burden of proof; and
5. The contingent fee contract contravened the public policy of Maryland.

## II

During the trial of this case MLCS asserted and attempted to prove that it had fully performed its obligations under the contract with Mrs. Dixon and Mr. Schackow. In his written opinion, after reviewing the testimony and voluminous exhibits, Judge Mitchell found:

"The Court concludes from all of the evidence that the Plaintiff did meet most of its obligations under the contract. MLCS did let down at times, but over the two-year period its personnel assisted Mr. Schackow and his associates in many ways. By March, 1977, Mr. Schackow probably could have done without MLCS's help, but in the preceding years MLCS's assistance was substantial and of great value to the lawyer inexperienced in medical malpractice work. While MLCS should have done more to aid the Defendant with experts, the corporation did give him a lot of help in this area, too. Accordingly, the Court concludes that MLCS's breaches did not prevent it from performing substantially everything that could have reasonably been expected under the contract."

On appeal, Mr. Schackow attacks this finding, contending that the trial court should have found that MLCS was guilty of major and material breaches in the performance under the contract.

It is firmly entrenched in the law of Maryland that:

"What is or is not substantial performance of a contract is a question of fact to be determined by the trier of facts in the light of the circumstances of each case."

*William F. Klingensmith, Inc. v. David H. Snell Landscape Contractor, Inc.,* 265 Md. 654, 665, 291 A.2d 56, 62 (1972). *See Pleasant Place, Inc. v. Levinson,* 260 Md. 279, 290, 272 A.2d 35, 41 (1971); and *Evergreen Amusement Corp. v. Milstead,* 206 Md. 610, 621, 112 A.2d 901, 906 (1955). Of

course, we cannot reverse the trial court's finding that the contract was substantially performed, unless our review of the record discloses that the trial court committed clear error in making its findings. *Id.*; Md. Rule 1086.

Mr. Schackow's position, as stated in his brief, is that the "failure of MLCS to obtain, prepare and deliver experts was . . . a material breach that went to the essence of the contract." Specifically, he complains that MLCS did not have experts to testify against Dr. Quick, the neurologist, Dr. Dickhaus, the radiologist, and the hospital.

In the contract that forms the basis of the subject action it was stated "that MLCS will exert its best efforts and abilities on this case. . . ." MLCS did find two neurologists who agreed to testify for the plaintiff. Dr. Haase, however, eventually concluded that there was no negligence in the case. The delay, blamed on MLCS by Mr. Schackow, in submitting medical records or depositions to Dr. Haase did not, apparently, influence his ultimate conclusion that medical malpractice was not present in the case. Dr. Winkler, also obtained by MLCS, was willing to testify in person or on videotape, but he could not personally appear for trial due to a prior commitment. Mr. Schackow declined the opportunity of taking his deposition for subsequent use at trial.

After hearing all the evidence the trial court made specific findings with respect to the performance of the consultants which may be summarized as follows:

1. MLCS helped Mr. Schackow "in many ways. They helped him obtain the necessary background knowledge for trying a malpractice case. . . . MLCS also continually discussed tactics with Mr. Schackow; . . ."

2. "MLCS assisted Mr. Schackow with the discovery process. [Its] personnel suggested interrogatory questions. People from MLCS helped to prepare Mr. Schackow for the depositions of defense witnesses;"

3. "MLCS also used its efforts to locate and prepare expert witnesses for Mrs. Dixon's case;"

4. "MLCS directed Mr. Schackow to Drs. Chapman and Pepper, helped to prepare these experts, and persuaded them to work with Mr. Schackow;" and

5. "Finally, MLCS helped Mr. Schackow once the Dixon trial had begun. He was provided with an extensive medical brief.... MLCS also supplied Mr. Schackow with possible cross-examination questions.... [A]fter the defense noted an appeal, MLCS advised Mr. Schackow regarding the appeal."

The plaintiff in the underlying malpractice case received a $1,500,000.00 verdict using the expert testimony provided by two general practitioners located by MLCS. Obviously, MLCS, with its percentage fee agreement, had every incentive to ensure that the verdict would be as large as possible and against the greatest possible number of defendants. We have reviewed the voluminous record in this case. The failures of MLCS were considered by the trial court and found to be minor, and it reiterated "that MLCS performed substantially everything that reasonably could have been expected of it over the two-year period." That finding, supported by substantial evidence, is not, on this record, clearly in error.

## III

Mr. Schackow also argues that the trial court erred in applying the doctrine of substantial performance by placing on him the burden of proving the value of work not performed by MLCS. He avers that Maryland law places on a plaintiff relying upon the doctrine the burden of proving the damages that are to be subtracted from the contract price.

The leading Maryland case dealing with the burden of proof under the doctrine of substantial performance is

*William F. Klingensmith, Inc. v. David H. Snell Landscape Contractor, Inc., supra,* 265 Md. at 666, 291 A.2d at 63, where the Court of Appeals heavily relied upon *Spence v. Ham,* 163 N.Y. 220, 57 N.E. 412 (1900). The New York Court of Appeals said in that case:

> "He who relies upon substantial [performance] as contrasted with complete performance must prove the expense of supplying the omissions, or he fails in his proof; for he cannot recover for full performance when a part of the contract is still unperformed. . . . This is an essential part of substantial performance, and hence the proof should be furnished by the one who claims substantial performance." (Citations omitted.)

*Id.* at 226, 57 N.C. at 413. In *Klingensmith,* an action by a landscaping contractor against its subcontractor, the Court remanded the case without affirmance or reversal for the plaintiff to prove the cost of the work which had not been performed. Mr. Schackow asserts that the trial court erred and that a remand of the case is required for further proceedings on the damages issue.

As previously noted, the trial court found three categories in which potential damages for incomplete performance by MLCS existed. The court stated:

> "First, Mrs. Dixon might have had trouble obtaining satisfaction of the judgment because there were not verdicts against all of the defendants. The evidence did not indicate, however, that she had such a problem."

Mr. Schackow does not contest this finding on appeal.

For the third category of potential damages the trial court stated:

> "Mr. Schackow produced evidence that because there were directed verdicts for Drs. Quick and Dickhaus, the Florida Court assessed a judgment for costs against his client and in favor of these doctors."

Since the judgment for costs was settled for $13,000.00, the trial court deducted that sum from the contract price due the plaintiff, and Mr. Schackow does not except to this ruling.

It is the second damage category and the trial court's treatment of it that has come under attack. The court found that "Mr. Schackow might be entitled to be compensated for doing work that MLCS should have performed under the contract." In computing the damages that could be assessed under this second category, however, the court ruled:

> "While the burden of proof is on the Plaintiff regarding the amount of damages to be subtracted, . . . the Court refuses to engage in pure speculation for the Defendant's benefit."

The latter statement is what gives rise to Mr. Schackow's complaint. He believes that "the trial court was manifestly in error. By attempting to transfer the burden of both proceeding and proof to the defendant, the trial judge has ignored Maryland law."

It is clearly the law of Maryland that once the court finds that a contract has been merely substantially performed, it is incumbent upon the plaintiff to prove the expense of supplying the omissions. *William F. Klingensmith, Inc. v. David H. Snell Landscape Contractor, Inc., supra,* 265 Md. at 666-67, 291 A.2d at 63.[3]

---

**3.** Corbin criticizes the Maryland rule, stating:

"The reasons against this rule are pretty strong. The defendant, also, is making an affirmative claim. He did not have to bring the first action because, fortunately for himself, he has not yet paid the contract price in full. In practically every case, however, he has withheld too much, and to that extent is in the wrong. There is as much reason for making him prove his injury and its extent as for requiring the contractor to prove his asserted claim."

3A *Corbin on Contracts* § 710 pp. 340-41 (1960). The 1980 Supplement to *Corbin* calls the Maryland approach "oldfashioned" and characterizes *Klingensmith* as "Maryland's fall from grace. . . ." *Id.* at p. 516 (1980 Cum. Supp.). Whatever reservation we may have regarding the *Klingensmith* rule, it is the Maryland law as elucidated by the Court of Appeals and until overruled, we are bound to follow it.

Professor Corbin has pointed out that:

> "The evidence may show that although there was a breach by the contractor there was no injury resulting, in which case there is no deduction from the contract price."

3A *Corbin on Contracts* § 710, p. 342 (1960) *citing Jacobs & Young v. Kent,* 230 N.Y. 239, 129 N.E. 889 (1921).

*Klingensmith* makes plain that the ultimate risk of persuasion on the issue of damages under the doctrine of substantial performance is upon the plaintiff. However, we deem it implicit in *Klingensmith* that once the substantial performance doctrine is injected into the case, the burden of going forward with the evidence shifts to the defendant. In the instant case, Mr. Schackow testified that MLCS's incomplete performance caused him and his associates to do some things that MLCS should have done. Mr. Streit, an associate employed by Mr. Schackow's firm and whose sole assignment consisted of work on the Dixon case,[4] testified that he had performed extensive medical research during his preparation of the case. After reviewing this evidence, the trial court found that "[t]he Defense did not specify in any detail what was due that MLCS should have done. . . ." Our review of the record and particularly the testimony of Messrs. Schackow and Streit confirms the trial court's conclusion. Because the evidence of the defense did not establish what the law firm was required to do that should have been accomplished by MLCS, Mr. Schackow did not prove his entitlement to damages for this second category — he did not meet his burden of going forward with the evidence.

We observe, in this connection, that Corbin suggests a

---

4. We note that it is not unusual in a case of such complexity and significance as Mr. Dixon's to have a junior associate attorney devoting a substantial portion of his time assisting in the preparation. There was no testimony that Mr. Streit would not have been hired but for MLCS's failures. Nor was any contemporaneous displeasure with MLCS's performance manifested in the many letters sent by Mr. Schackow to MLCS during the course of Mr. Streit's employment.

sensible procedure to govern the application of the *Klingensmith* rule:

"[I]t would be at least appropriate for courts which have not abandoned the older rule . . . to excuse the substantial performance claimant from putting on evidence of the costs of repair of defects until the other party has gone forward with evidence showing that such defects existed and specifying them with sufficient particularity that the contractor knows exactly which items it is supposed to owe a duty to cure."

3A *Corbin on Contracts* § 710, p. 517 (1980 Cum. Supp.). This approach has practical underpinnings. It places the initial burden of pinpointing the items of damage for non-performance upon the party with ready access to the facts. And it avoids giving the plaintiff the impossible task of anticipating and attempting to refute every conceivable failure that might or might not be raised by the defendant. And finally, it conserves judicial resources by requiring the plaintiff to prove a value for only those defects which have been previously established by the defendant.

The trial court properly applied the *Klingensmith* rule and did not err in refusing to reduce MLCS's recovery under the contract on this second category of damages.

## IV

Mr. Schackow's final contention is that the contract with MLCS is void because it offends the public policy of Maryland. He levels a three-pronged attack at the contract, contending that it raises serious issues of barratry, champerty and maintenance, and public policy. We shall discuss his arguments *seriatim*.

### (a) *Barratry*

The essence of barratry is the *solicitation* of another to

make a litigious claim by one without an existing relationship or interest for his own gain; it is a crime in this State punishable by fine or imprisonment. Md. Ann. Code, art. 27, § 13 (1976). Mr. Schackow avers that "MLCS's solicitation of and contracting here is to retain 'another's services in so suing or making a litigious claim.' " [5] In his reply brief he asserts that MLCS " 'strongly urged' the maintenance of the underlying lawsuit while having no existing relationship or interest in the issue."

We agree with MLCS that there is no proof of solicitation, an essential element of the crime of barratry. MLCS was contacted by Mr. Schackow's law firm on the basis of a recommendation from another Florida attorney. Although MLCS did advertise its services in various legal publications, it never initiated the contact with Mr. Schackow about the Dixon case. Since MLCS did not solicit Mrs. Dixon or Mr. Schackow within the meaning of Md. Ann. Code, art. 27, § 13 (1976), the contract entered into by the parties is not a product of barratrous activities.

### (b) Champerty and Maintenance

Citing Merrell v. Stuart, 220 N.C. 326, 17 S.E.2d 458 (1941), Mr. Schackow argues that MLCS was guilty of champerty and maintenance because it assisted Mrs. Dixon in prosecuting her case in exchange for a share of the recovery. In Merrell an agreement with a non-lawyer for

---

5. The Code provides in pertinent part:

"Whoever, for his own gain, and having no existing relationship or interest in the issue, directly or indirectly, solicits another to sue at law or in equity, or to make a litigious claim, or to retain his own or another's services in so suing or making a litigious claim; or whoever knowingly prosecutes a case in which his services have been retained as a result of such solicitation. . . ."

In Mr. Schackow's view the portion of the barratry statute that was violated by MLCS involves MLCS's solicitation of Mrs. Dixon "to retain his own or another's services in so suing or making a litigious claim; or . . . [to prosecute] a case in which his services have been retained as a result of such solicitations. . . ." Md. Ann. Code, art. 27, § 13 (1976). Solicitation, as it is used in § 13, is to be understood by its common, everyday meaning and not by reference to the common law crime of solicitation. In re Appeal No. 180, 278 Md. 443, 447, 365 A.2d 540, 542 (1976).

investigation and production of evidence in exchange for a percentage of the recovery was held to be champertous and thus void as against public policy. *Id.* at 333, 17 S.E.2d at 463.

Black's defines champerty and maintenance as:

> "A bargain by a stranger with a party to a suit, by which such third person undertakes to carry on the litigation at his own cost and risk, in consideration of receiving, if successful, a part of the proceeds or subject sought to be recovered. . . . 'Maintenance' consists in maintaining, supporting, or promoting the litigation of another."

Black's Law Dictionary (5th ed. 1979). This Court has recently defined the terms:

> "Maintenance exists when a person 'without interest' in a suit officiously intermeddles by assisting either party, . . . champerty adds the element of an agreement for payment from the subject matter of the suit."

*Lahocki v. Contee Sand & Gravel Co.,* 41 Md. App. 579, 608, 398 A.2d 490, 507 (1979), *rev'd on other grounds sub nom. General Motors Corp. v. Lahocki,* 286 Md. 714, 410 A.2d 1039 (1980). *See also Schnabel v. Taft Broadcasting Co.,* 525 S.W.2d 819, 823-25 (Mo. App. 1975).

In *Merrell* the court indicated that an agreement by a litigant with a disinterested third party becomes champertous when "it contemplates litigation and, for a share of the recovery, calls for procurement of evidence essential to success." *Merrell v. Stuart, supra,* 220 N.C. 326, 332, 17 S.E.2d 458, 462 (1941). Other courts, however, which have considered the question have found similar arrangements to be ethical and not champertous. *See, e.g., Haley v. Hollenback,* 53 Mont. 494, 165 P. 459 (1917) (contingent fee contract for procuring witnesses for trial); *Bell County Board of Education v. Lee,* 239 Ky. 317, 39 S.W.2d 492 (1931) (contingent fee contract for audit based on recovery); and *Barnes v. Boatmen's National Bank of St.*

*Louis,* 348 Mo. 1032, 156 S.W.2d 597 (1941) (contingent fee contract with psychiatrist to find evidence).

Contingent fees for the services of an attorney in most civil cases are permissible in Maryland when they provide a means for obtaining the services of an attorney by one having a claim against another; when the client could not otherwise afford a competent attorney; and when successful prosecution of the claim will provide a *res* from which the fee can be paid. *See generally* Code of Professional Responsibility of the Maryland State Bar Association, Ethical Consideration 2-20.

MLCS president, Robert J. Militana, described his organization as "largely an extension of the attorney's work product in the area of of medicine." Under its arrangements the attorney controls all aspects of the litigation. MLCS acts only on request and does not perform functions beyond its consulting, educational, and evidence-gathering roles. On this record we cannot find that MLCS was an "officious intermeddler" which attempted to stir up litigation. The realities of modern medical malpractice may necessitate resort to technical assistance for the education of counsel inexperienced in such litigation, endeavoring to obtain expert witnesses, and marshalling evidence to support the claim. Clients who can afford attorneys only on a contingent fee basis cannot be expected to compensate a service, such as MLCS, at a flat rate.

We find nothing in the contract between MLCS, Mr. Schackow, and Mrs. Dixon that is champertous. *See* also ABA Comm. on Professional Ethics, Informal Opinion, No. 1375 (1976) (nothing in the Code of Professional Responsibility prohibits a contingent fee contract with a consulting service so long as: 1) the service does not engage in the unauthorized practice of law; 2) the lawyer does not share legal fees with the service; and 3) the fee is not payable for the service's testimony).

### (c) *A Contingent Fee in Exchange for the "Delivery" of Expert Testimony*

Mr. Schackow finally argues that MLCS bargained for a

contingent fee in exchange for the testimony of its experts, and queries whether the fee agreement is against public policy. He asserts that "in helping to prepare the various experts to testify MLCS seeks to skirt ethical and public policy considerations by its contention that in the final analysis the expert witness only testifies if his own opinion 'agrees' with that of MLCS." While it is apparent that MLCS itself studies a case — through its staff which includes licensed physicians — and prepares a "corporate analysis" which it forwards to the prospective expert witness, the trial court found that the analysis "reads more like an introduction to the case and a brief suggestion of the reasons for malpractice [rather] than an attempt to tell a doctor what he should say." We think this interpretation is correct.

In addition, it is evident that the doctors contacted by MLCS were highly reputable and of independent minds. Doctors Haase, Davis, and Shafey, after initially agreeing to review the records, were unable to testify that negligence was evident in Mr. Dixon's treatment, despite being provided with the MLCS analysis that indicated a meritorious malpractice claim. It is clear beyond cavil that MLCS purported only to contact medical experts and that no attempt or guarantee was made to "deliver" expert testimony in exchange for a contingent fee. All the experts were to be paid a flat fee by the client. MLCS's role was limited to locating potential experts and then educating them about the case for Mr. Schackow. That arrangement does not violate the public policy of Maryland.

*Judgment affirmed; costs to be paid by appellant.*