689 A.2d 645

**Danny SON,**

v.

**MARGOLIUS, MALLIOS, DAVIS, RIDER & TOMAR et al.**

**No. 313, Sept. Term, 1996.**

Court of Special Appeals of Maryland.

Feb. 26, 1997.

Joseph M. Mott (J. Stephen McAuliffe, III and Miles & Stockbridge, P.C., on the brief) Rockville, for Appellant.

Barry J. Rosenthal (Bromberg, Rosenthal & Siegel, on the brief for appellees, Jennifer Park and Park Consultants) Rockville, Albert D. Brault (David G. Mulquin and Brault, Graham, Scott & Brault, on the brief) Rockville, for Appellees.

Argued before MOYLAN, WENNER and HARRELL, JJ.

HARRELL, Judge.

Danny Y. Son, also known as Yong C. Son, appeals from a judgment of the Circuit Court for Montgomery County that concurrently denied his motion for summary judgment and granted summary judgment to appellees. The beneficiaries of the alleged error were Margolius, Mallios, Davis, Rider & Tomar (referred to hereinafter as the "law firm" or the "firm"), Gary A. Stein, Esquire, a partner in the law firm and Mr. Son's attorney in a collateral action, and Jennifer Park, the Korean–American consultant who is at the center of this controversy. Mr. Son brought his action to void an alleged illegal contract, and asserting as well counts sounding in fraud, constructive fraud, negligence, and civil conspiracy. He sought to recover $242,500.00 in fees paid to Ms. Park and $1.139 million in legal fees retained by the law firm and Mr. Stein. We shall affirm the trial court's grant of summary judgment regarding the contract avoidance count and reverse as to the remaining counts.

## *FACTUAL BACKGROUND*

The parties assert that this case is as much about the clash of Korean and American cultures [1] as it is the evils of barratry and fee-splitting, and the regulation of such conduct. This controversy began when Mr. Son was involved in a serious motor vehicle accident on 5 August 1992. The resultant injuries left him a quadriplegic. Mr. Son and his wife [2] are Korean immigrants with concededly limited knowledge of American customs and the English language. Ms. Park testified that approximately two days after the accident, Ms. Son contacted her to ask for "help" in finding a lawyer. Mr. Son

---

1. Appellees argue that employment of consultants, like Ms. Park, is essential to the day-to-day existence of Korean Americans struggling to survive. Although we acknowledge that certain language and cultural barriers most certainly affect the lives of such immigrants, they are nonetheless governed by our laws.

2. Mr. Son was granted an absolute divorce from his wife, Tae Yon "Mina" Son, on 5 March 1996.

contends that Ms. Park was well known in the Korean community in the Washington, D.C. metropolitan area as someone who located lawyers for Koreans in need of legal services. His position is supported by Ms. Park's own testimony that she had been helping members of that community find lawyers for over 15 years. Ms. Son essentially testified that the reason she contacted the consultant was that Ms. Park held herself out to the Korean community as a coordinator of legal services. Specifically, she testified that "the Korean people do not know where they find out (sic) attorney". Ms. Park testified that she often had multiple clients at any one time and performed lawyer referral services for other types of litigants, in addition to personal injury plaintiffs, in Washington, D.C., Maryland, and Virginia.

Ms. Son and Ms. Park became acquainted before Mr. Son sustained his injuries. Approximately 6 years before the accident, Ms. Park employed Ms. Son as a bookkeeper. It is through this relationship, Ms. Park asserts, that Ms. Son knew of her reputation as a consultant. In any event, Ms. Park agreed to provide the names of attorneys to Ms. Son. She provided Ms. Son with a list of three attorneys. Attorney Stein's name was first on that list. Mr. Stein and the law firm, although maintaining their principal office in Washington, D.C., had offices in Rockville, Maryland. Mr. Stein was admitted to practice law in Maryland. It is unclear from the record whether Ms. Park intimated to Ms. Son that Mr. Stein was the best choice on the list or how involved Ms. Park was in his selection. Mr. Stein, however, ultimately was selected and arrangements were made for Ms. Park and Ms. Son to meet with Mr. Stein.

Mr. Son remained comatose for several weeks after his accident. His wife, therefore, began to forge contractual relations with Ms. Park and Mr. Stein purportedly on her husband's behalf. On 12 August 1992, Ms. Son signed a written contract agreeing to pay 10% of the proceeds of any settlement or judgment, separate and apart from the attorney's fees, to Ms. Park. On that same date, Ms. Son executed a retainer agreement, signed by her and Mr. Stein, securing

the services of the law firm and setting their fee at 30% of the amount recovered. The fee increased to 35% if the case went to trial.

Not long after Mr. Son regained consciousness, he was presented with a document entitled "General Power of Attorney" that purportedly authorized his wife, *inter alia*, to enter into contracts, manage business affairs, and commence and prosecute any suits or legal actions. Mr. Son signed the document in the presence of a Notary Public on 22 September 1992. His competency, at that time, to have done so is disputed.[3]

On or about 11 November 1992, a new consulting agreement between Ms. Park and Ms. Son was signed. This agreement detailed the nature of their arrangement. Ms. Park agreed to provide extensive "consulting services" to the Sons. Particularly of interest to our analysis, Ms. Park and Ms. Son agreed that:

> Ms. Park will act as a consultant to [the Sons] for so long as necessary *to assist in all activities necessary for the ultimate prosecution of their claims other than legal services.* Such services include, but are not limited to, translation (Korean/English), advocacy and negotiation with health care providers and community resources to assist [the Sons] in their day-to-day activities during the pending litigation, investigation services, research, paralegal support to the attorney representing [the Sons] in their claims, acting as a liaison between [the Sons'] attorney and the Korean community and other support services to [the Sons] and their attorney as may be required from time to time.
>
> Consultant will cooperate and work with [the Sons'] attorney and agrees to carry out appropriate tasks based on her

---

**3.** Although the document is notarized, thereby confirming that Mr. Son did sign, he did so just a few days after gaining consciousness. Indeed, Mr. Son's "signature" on this document consists of two scrawled lines that do not intersect and in no way are intelligible as a signature in any known language. In short, the "signature" suggests that the signatory was laboring under some form of impairment.

skills to assist in the pending litigation. Consultant will always be available for any court proceeding, deposition, meeting with Koreans or any other time her appearance is appropriate or requested. It is understood, however, that under no circumstances is [Park] to be engaged in any activity that may be construed as providing legal services.

By means of this agreement, [the Sons'] attorney is hereby authorized and instructed to pay to [Park] a sum equal to 6.5% of any recovery ... if the case is tried, or 5% if the case is settled [the Sons'] receive from any source for the injuries sustained [by Mr. Son]. (sic) Said sums are to be paid to [Park] before any sums are turned over to [the Sons].

Any sums payable under the *terms of this agreement are separate and apart from any fee agreement [the Sons] may have reached with their attorney and the terms of this agreement are in no way related to such separate agreement [the Sons] have with their attorney.*

(Emphasis added).

Attorney Stein apparently was present when this agreement was signed by the consultant and Ms. Son. He initialled that portion of the agreement that set forth the percentages to be paid to Ms. Park, evidencing his power to disburse money to her directly. Additionally, he signed a statement at the bottom of the agreement acknowledging that he "agree[ed] to follow the terms of this agreement and to disburse funds to Jennifer Park in accordance with its terms when and if a recovery is obtained for [the Sons]."

On 3 December 1992, Ms. Son signed two new retainer agreements with the law firm. The new agreements differed from each other in only one significant way. One retainer indicated that the firm's legal fees would equal a sum of 28.5% of the recovery if the matter settled and 33.33% if the case was tried. The other agreement set the fees, on a similar bifurcated scheme, at 23.5% and 26.83%, respectively. Mr. Son contends that the two retainer agreements were signed in an effort to conceal the illegal nature of the contract between

appellees from Mr. Son and others. Specifically, he indicates that the 23.5% and 26.83% fee values result from the subtraction of Ms. Park's fee from the fee values used in the other contemporaneously executed agreement. Appellees contend that this is a mere coincidence. The two separate agreements are, they assert, the result of standard fee negotiations. Mr. Stein testified that he did not know the specifics of the financial agreement between the Sons and Ms. Park when first approached. He acknowledged that he later knew that Ms. Park had been engaged to help the family by providing many services, including finding a lawyer. Evidence adduced by Mr. Son, however, shows that, at least on one prior occasion, Mr. Stein had dealt with Ms. Park in a similar situation and knew the nature of her services.

Mr. Stein and the law firm prepared for the trial of Mr. Son's personal injury action. Ultimately, they helped Mr. Son settle that case for $4.85 million. The firm prepared a settlement sheet, ultimately signed by the Sons and witnessed by Mr. Stein. That settlement sheet revealed the following, in pertinent part:

| | |
|---|---|
| Total Recovery: | $4,850,000.00 |
| Less: | |
| Attorney's Fees: (28.5%) | $1,382,250.00 |
| Legal Costs: | $ 24,865.22 [4] |
| Outstanding Medical Bills: | $ 500,424.18 |
| Net Recovery: | $2,942,460.60 |

Nowhere on the final settlement sheet [5], or the proposed settlement sheets supplied to Mr. Son previously, did the law firm reveal the fees paid to Ms. Park. In fact, the firm issued a client trust fund check payable to itself on 11 January 1994 for $1,139,750.00. That sum is precisely $242,500.00 less than the attorney's fee revealed on the final settlement sheet. A

---

**4.** These costs included $396.74 for a Korean interpreter, a service Ms. Park contends she performed.

**5.** Such a settlement report in a contingency fee case is required by Md.R.Prof.Conduct 1.5(c).

check, drawn on the firm's client trust account, for $242,500.00 was issued the next day to Ms. Park.[6] This corresponds exactly to the 5% fee payable to her pursuant to the consulting agreement.

Mr. Son's Complaint requested voidance of the fee retainer agreements, and the consulting agreement, alleging those agreements were illegal and against public policy. Specifically, he alleged that the agreements were barratrous, and amounted to illegal fee-splitting and paid referral arrangements. Count I of Mr. Son's Complaint alleged:

*COUNT I*

(Illegal Fee-splitting Contract Void for Public Policy Against All Defendants)

\* \* \* \* \* \*

28. Defendant Park *illegally solicited* the Plaintiff's wife, [Mina] Son, to retain Defendants Stein and The Law Firm to represent the Plaintiff, Danny Son for personal gain *in violation of the Maryland Lawyers Act, Md.Bus.Occ.Code Ann. § 10–604(a)(i) (1989 & Supp.1994).*

29. Defendant Stein and The Law Firm *knowingly represented* the Plaintiff's wife, [Ms.] Son, and the Plaintiff Danny Son despite its knowledge that the representation had been procured by *solicitation in violation of the Maryland Lawyers Act.* . . .

30. The Consulting Agreement . . . is a thinly veiled subterfuge by which Stein and The Law Firm undertook to *pay*

---

**6.** The check was made payable to Park Consultants & Associates, Ltd. Ms. Park signed an assignment of settlement proceeds thereby transferring her interest in the settlement proceeds to her recently incorporated business. This document was signed on 12 January 1994, the same day the firm issued the check.

*a percentage of the fee* which The Law Firm received from the Plaintiff to Defendant Park *as a referral fee.*

31. [Ms.] Son, the Plaintiff's wife, *knowingly participated in the illegal fee splitting agreement* between The Law Firm and Defendant Park. . . .

(Emphasis added).

The parties allotted much of their argument below, and on appeal, to a discussion of the elements of Maryland's Barratry Act, found in Md.Bus.Occ. & Prof.Code Ann. § 10–604 [7] (hereinafter referred to as "the Act" or the "Barratry Act"). Although the parties thus consumed much of their argument, Mr. Son clearly alleged barratry, fee-splitting, and improper payment of referral fees. Barratry is prohibited by Md.Bus. Occ.Code Ann. § 10–604. Fee-splitting is proscribed by Md.R.Prof.Conduct 5.4(a) [8]. We also note that paying referral fees to another for recommending a lawyer's services is de-

---

7. The Act specifically provides, in relevant part,:

 **§ 10–604. Barratry.**
 (a) *In general.*—Without an existing relationship or an interest in an issue:

 (1) a person may not, for personal gain, solicit another person to sue or to retain a lawyer to represent the other person in a lawsuit; and

 (2) a lawyer, except as provided in the Rules of Professional Conduct, may not:
 \* \* \* \* \* \*
 (iii) knowingly represent a person who retained the lawyer as a result of solicitation prohibited under this section;
 \* \* \* \* \* \*
 (b) *Presumption of compensation*—Any solicitation involving the acts described in this section is prima facie evidence that the person soliciting is acting for gain.

8. Appellant claimed that the combination of agreements amounted to a "thinly veiled subterfuge" that constituted an illegal-fee splitting agreement. Appellant alleged that his contracts with the law firm and Ms. Park should be considered void for public policy reasons. Although appellant's Complaint and brief do not cite Md.R.Prof.Conduct 5.4(a), he sufficiently placed before the trial court and this Court alleged violation of that Rule. The relevant portion of the Rule provides that "[a] lawyer or law firm shall not share legal fees with a nonlawyer. . . ." Ms. Park admitted in her deposition testimony that she was not a lawyer at any time pertinent to the operative facts of this case.

cried in Md.R.Prof.Conduct 7.2(c).[9] Mr. Son does not specifically cite the Rules of Professional Conduct addressed to fee-splitting or payment for referrals.

Additionally, appellant alleged civil conspiracy against all appellees, as well as constructive fraud, fraud, and negligence against the law firm and Mr. Stein. The trial judge granted summary judgment in favor of all appellees on all counts and denied appellant's motion for summary judgment in a nondescript order. We cannot be certain, therefore, of the reasoning behind, or the basis for, the judge's actions. Appellees essentially argued that no violation of the barratry statute occurred and, therefore, summary judgment on the contract avoidance count was proper. Appellees further contend that judgment on the contract avoidance count, coupled with Mr. Son's grant of power of attorney to his wife, eviscerates his other claims.

## ISSUES

The parties advanced the following issues, that we have reordered and rephrased, for our review:

I. Did the court err in denying appellant's motion for summary judgement?

II. Did appellees violate the Barratry Act?

III. Did appellant properly place in dispute the existence of a contract between Ms. Park and the law firm?

IV. Did the court err in granting summary judgment on appellant's claim that the various agreements between the parties were illegally barratrous and, therefore, void as against public policy?

V. Did the court err in granting summary judgment on appellant's claim that the various agreements between the parties were illegal fee-splitting or improper referral payment contracts and, therefore, void as against public policy?

---

**9.** The rule provides that "a lawyer shall not give anything of value to a person for recommending the lawyer's services, except that a lawyer may pay the reasonable cost of advertising or written communications permitted by the Rule and may pay the usual charges for a not-for-profit lawyer referral service or other legal service organization."

VI. Could the court have awarded summary judgment on appellant's fraud, constructive fraud, negligence, and conspiracy counts based upon appellant's actual or constructive knowledge of appellees' agreement?

VII. Could the court have awarded summary judgment on appellant's fraud, constructive fraud, negligence, and conspiracy counts based upon the lack of a barratry violation?

## *DISCUSSION*

### *Preface*

We note from the outset that when reviewing a trial court's grant of summary judgment, we must determine whether the trial court was "legally correct". *E.g., Baltimore Gas & Elec. Co. v. Lane,* 338 Md. 34, 42–43, 656 A.2d 307 (1995); *Beatty v. Trailmaster Prods., Inc.,* 330 Md. 726, 737, 625 A.2d 1005 (1993); *Heat & Power Corp. v. Air Prods. & Chems., Inc.,* 320 Md. 584, 590, 592, 578 A.2d 1202 (1990). Appellees were entitled to summary judgment if they could show, through affidavit, deposition testimony, or otherwise, that there were no genuine disputes concerning material facts and that they were entitled to judgment as a matter of law. Md.Rule 2–501. Additionally, all reasonable inferences from these facts must be drawn in favor of the non-moving party, Mr. Son. *E.g., King v. Bankerd,* 303 Md. 98, 111, 492 A.2d 608 (1985); *Peck v. Baltimore County,* 286 Md. 368, 381, 410 A.2d 7 (1979); *Maloney v. Carling Nat'l Breweries,* 52 Md.App. 556, 561–62, 451 A.2d 343 (1982); *Robertson v. Shell Oil Co.,* 34 Md.App. 399, 403, 367 A.2d 962 (1977).

The trial judge did not elucidate how he arrived at his decision. When analyzing a grant of summary judgment, this Court is ordinarily limited to the basis relied upon by the trial judge. We will usually refrain from introducing new legal theories. *See Cheney v. Bell Nat'l Ins. Co.,* 315 Md. 761, 764, 556 A.2d 1135 (1989); *Geisz v. Greater Baltimore Medical Ctr.,* 313 Md. 301, 314 n. 5, 545 A.2d 658 (1988); *Warner v. German,* 100 Md.App. 512, 517, 642 A.2d 239 (1994). This principle finds its support in the notion that we shall not

"deprive the judge of discretion to deny or to defer until trial on the merits the entry of judgment on such issues". *Geisz*, 313 Md. at 315, 545 A.2d 658 (quoting *Henley v. Prince George's County*, 305 Md. 320, 333, 503 A.2d 1333 (1986)).

■ As previously noted, in the instant case we do not know the basis of the trial judge's grant of summary judgment. We may, under such circumstances, consider any legal theory or issue that was before the judge pursuant to the motions for summary judgment. We mention this because, although we may perceive that Mr. Son may encounter difficulty in adducing sufficient evidence as to certain elements of some of his causes of action, we may consider here only those arguments actually asserted by appellees in their motions for summary judgment.

We must comment on the condition of the joint record extract provided to this panel by the parties. This 273 page extract contained a table of contents listing only 21 entries. One forty page portion of the extract contained under one entry consisted of numerous unlabeled exhibits. This entry, similar to the vast majority of the others, was simply labeled "Exhibits attached to Memorandum of Points and Authorities" without disclosing the identity of those exhibits. These sparse entries forced the panel to leaf constantly through the extract in search of more discrete portions of the record. This table of contents clearly violates Md.Rule 8–501(h), which expressly requires specific identification of exhibits. This Rule was adopted expressly to avoid wasting an appellate court's time.[10]

---

10. We are never required to "ferret out" from the record evidence omitted from the extract. *Eldwick Homes Ass'n v. Pitt*, 36 Md.App. 211, 373 A.2d 957, *cert. denied*, 281 Md. 736, 741 (1977); *Hamilos v. Hamilos*, 52 Md.App. 488, 497 n. 3, 450 A.2d 1316 (1982). We are also not required to consult the record for information that we cannot find readily due to a record extract filed in a state clearly in violation of the rules governing such. As we said in *Evans v. Shore Communications, Inc.*, 112 Md.App. 284, 310, 685 A.2d 454 (1996) (citing *von Lusch v. State*, 31 Md.App. 271, 281–82, 356 A.2d 277 (1976)), "appellate courts cannot be expected to delve through the record to unearth factual support favorable to appellant and then seek out law to sustain appellant's position."

## I.

█ Mr. Son's motion for partial summary judgment was denied concurrently with the granting of appellees' summary judgment motions. He attempts to appeal that denial. We need not address the merits of his motion nor the propriety of its denial. A denial of summary judgment is not a final judgment and is, therefore, not generally appealable. *See, e.g., Porter Hayden Co. v. Commercial Union Ins. Co.,* 339 Md. 150, 164, 661 A.2d 691 (1995); *Merchants Mortgage Co. v. Lubow,* 275 Md. 208, 212, 339 A.2d 664 (1975); *Ralkey v. Minnesota Mining & Mfg. Co.,* 63 Md.App. 515, 492 A.2d 1358 (1985). *Cf. Mandel v. O'Hara,* 320 Md. 103, 134, 576 A.2d 766 (1990) (allowing appeal from denial of summary judgment when motion was based on absolute immunity and came under collateral order doctrine).

## II.

It is crucial to our analysis that our understanding of the cause of action brought by Mr. Son in the first count of his Complaint be clearly stated. We need not address, as appellees urge, the existence of a private cause of action for

---

Recently, the Court of Appeals said:
> Nor does the liberalization in Rule 8–501(c) alter the fundamental rule of appellate practice under which the appellate court has no duty independently to search through the record for error. *See State Roads Comm'n v. Halle,* 228 Md. 24, 32, 178 A.2d 319 (1962); *Van Meter v. State,* 30 Md.App. 406, 407–08, 352 A.2d 850 (1976); *GAI Audio of New York, Inc. v. Columbia Broadcasting Sys., Inc.,* 27 Md.App. 172, 182–83, 340 A.2d 736 (1975). Thus, the Court of Special Appeals has appropriately held that a party may lose the right to appeal on an issue by failing to indicate in that party's brief the location in the record where the alleged error occurred. *Mitchell v. State,* 51 Md.App. 347, 357–58, 443 A.2d 651, *cert. denied,* 459 U.S. 915, 103 S.Ct. 227, 74 L.Ed.2d 180 (1982). The same principle applies to the alleged cure of an error.

*ACandS v. Asner, et al.,* 344 Md. 155, 192, 686 A.2d 250 (1996) (on Motion for Reconsideration) (footnote omitted). Our failure to sanction the parties in this case should not be construed as condonation of these violations. Parties who similarly trespass on our patience in the future do so now at their peril.

violation of the statute prohibiting barratry.[11] Appellant did not bring a cause of action for private enforcement of the Act. He instead attempted to void his contracts with Ms. Park and the law firm, claiming such contracts had illegal or proscribed activity as their object. Mr. Son sought to retrieve the money paid to appellees under these alleged illegal agreements; i.e., the consulting contract and retainer agreement. The issue that directly concerns us, therefore, is not whether the appellees' conduct actually violated the Barratry Act. We, instead, must determine whether the various contracts between the parties had as their object the violation of public policy as expressed in statutes or rules of conduct.

All parties, and the trial court, seemed to miss this distinction. We are concerned most with the objective of the various agreements. Mr. Son alleges that the law firm and Ms. Park had an agreement to violate the prohibitions against barratry, fee-splitting, and paid lawyer referrals. Of course, the parties' actions such as may be consistent with violations of regulated conduct may be indicative of an illegal agreement.

In order to determine if the object of any contract was a criminal one, we must understand the crime itself and how it applies to the parties. Interestingly, the Barratry Act does not proscribe fee-splitting or paid referrals. Essentially, the statute requires that the barrator (1) have no interest in the litigation or existing relationship to the litigation, (2) take action for personal gain, and (3) solicit another to litigate. A lawyer may also engage in barratry if he or she knowingly represents a person who retained the lawyer through the use of a barrator.

---

11. The Act does expressly provide for criminal prosecution of violators. It does not similarly declare a private cause of action. In numerous cases, we have refused to find an implied private cause of action stemming from various regulatory statutes. *See, e.g., Maryland Comm'n on Human Relations v. Downey Communications, Inc.,* 110 Md.App. 493, 541, 678 A.2d 55 (1996); *Gunpowder Horse Stables, Inc. v. State Farm Auto. Ins. Co.,* 108 Md.App. 612, 673 A.2d 721 (1996); *Sugarloaf Citizens Assoc., Inc. v. Gudis,* 78 Md.App. 550, 554 A.2d 434 (1989).

■ The "interest or existing relationship" element excludes certain classes of persons from liability. One with "an existing relationship or interest in an issue" cannot be liable for barratry.[12] Appellees argue, not convincingly, that Ms. Park had an existing relationship and an interest in the litigation. They contend that Mr. Son's claim must fail based upon Ms. Park's "undisputed" relationship to the Sons and her interest in the issue. To allege this relationship and interest, appellees rely upon the prior employment relationship between Ms. Son and Ms. Park, as well as Ms. Park's interest in the personal injury action stemming from her consulting agreement. We conclude that Ms. Park's association with the Sons does not amount to an interest or existing relationship for the purposes of the Act.

■ In order to reach this conclusion, we must determine the meaning of the statutory language exempting those with an "existing relationship or interest in an issue." If the words of the statute are clear and unambiguous, our search for its meaning may begin and end with their plain meaning. *E.g., Board of Trustees of Md. State Retirement and Pension Systems v. Hughes,* 340 Md. 1, 7, 664 A.2d 1250 (1995); *see also Long v. State,* 343 Md. 662, 667, 684 A.2d 445 (1996) (citing *In re Victor B.,* 336 Md. 85, 94, 646 A.2d 1012 (1994)); *Harris v. State,* 331 Md. 137, 145, 626 A.2d 946 (1993); *Mustafa v. State,* 323 Md. 65, 73, 591 A.2d 481 (1991). When language is plain and unambiguous, and expresses a definite meaning consonant with the statute's purpose, courts must not insert or delete words to make it express an intention different from its clear meaning. *See e.g., In re Adoption/Guardianship No. A91–71A,* 334 Md. 538, 557–59, 640 A.2d 1085

---

**12.** This statement assumes that the person with the existing relationship or interest in the issue is the same person soliciting another to sue. We note that an attorney could be liable under that portion of the statute applicable only to members of the profession although the attorney has the requisite relationship or interest. In other words, if an attorney knowingly represents a client who was solicited for personal gain by a person without such a relationship or issue, then that attorney has violated the Act despite their own relationship to the potential litigant.

(1994); *Department of State Planning v. Mayor of Hagerstown*, 288 Md. 9, 15, 415 A.2d 296 (1980). We conclude that the language of the statute is plain and unambiguous. The phrase in controversy does not offer relief to Ms. Park and the law firm.

██ The parties focus on whether the term "relationship" includes the terminated employee/employer association between Ms. Park and Ms. Son. We conclude that it does not. The relationship between Ms. Park and Ms. Son was no longer "existing" as required by the statute. The words of a statute are to be given their ordinary meaning absent indications of contrary intent by the legislature. *E.g., In re Roger S.*, 338 Md. 385, 390–91, 658 A.2d 696 (1995); *Tidewater/Havre de Grace, Inc. v. Mayor of Havre de Grace*, 337 Md. 338, 344, 653 A.2d 468 (1995); *Richmond v. State*, 326 Md. 257, 262, 604 A.2d 483 (1992). We, therefore, will not disregard the drafters' use of "existing". Based upon the undisputed facts disclosed in the joint record extract, the employment relationship between Ms. Park and Ms. Son terminated years before Mr. Son's injury. We need not, and therefore do not, decide the number and quality of the relationships that qualify under the Act. We merely decide that whatever association Ms. Park had to the Sons, it was not existing at the time of Mr. Son's injury.

██ Appellees argue, in the alternative, that the Son–Park consulting agreement created the existing relationship or interest in the issue. More specifically, they assert that because the 12 August 1992 Son–Park contract was formed before the Son–Firm retainer agreement of the same date, Ms. Park had an interest in the issue. This logic fails because we conclude that such an interpretation would be absurd and essentially eviscerate the Act. Under appellees' interpretation, entering into barratrous contracts with potential litigants regarding the litigation would immunize the alleged barrator against liability under the statute. We will not interpret a statute so as to have such an absurd result. *In re Roger S., supra; Coerper v. Comptroller of the Treasury*, 265 Md. 3, 6, 288 A.2d 187 (1972); *Kline v. Fuller*, 56 Md.App. 294, 309, 467

A.2d 786 (1983). We presume that the legislature did not set out to create an ineffective or invalid law. *Swarthmore v. Kaestner*, 258 Md. 517, 525–27, 266 A.2d 341 (1970); *First Nat'l Bank v. Shpritz*, 63 Md.App. 623, 635, 493 A.2d 410, *cert. denied*, 304 Md. 297, 498 A.2d 1184 (1985). We conclude that Ms. Park's interest in the outcome of Mr. Son's personal injury action did not amount to an interest in the issue for the purposes of the Act.

▮▮▮ The Act also requires that the alleged barrator act for "personal gain". Appellees attempt to flank this issue by arguing that Ms. Park's gain in this case was not unique. They never dispute that she did, in fact, gain from the transaction. No party disputes that Ms. Park received $242,-500.00 from the law firm's trust account. Instead, appellees compare Ms. Park's services to the numerous lawyer referral services provided by bar associations. Appellees argue that Mr. Son does not distinguish Ms. Park's gain from those received by lawyer referral programs. Mr. Son responded by claiming that those programs do not experience gains because most are not operated for profit. We need not address either argument directly.

Our response to appellees' argument is one reminiscent of that timeless maternal warning "just because others do it doesn't make it right". Appellees do not claim that the statute is inequitably enforced contrary to some state or federal constitutional provision. The instant case is a civil action between private parties. A defense based upon similar actions of others is not effective in this setting. Appellees also fail to acknowledge that the very reason these various referral services are not prosecuted for barratry is likely because they do not violate other elements of the crime, i.e. lack of solicitation or presence of existing relationship.

We shall not embark on an extended analysis of what amounts to a personal gain under the Act, as that is not essential to our decision. The parties would have us determine the extent to which non-profit versus commercial referral activities result in a "gain". We need only consider whether

Ms. Park's acceptance of $242,500.00 amounted to personal gain. We conclude that it did.

The existence of "solicitation", as required by the statute, was the issue litigated most heavily below and argued most extensively on appeal. Essentially, appellees argue that because Ms. Son initiated the contact with Ms. Park there could be no solicitation. Conversely, Mr. Son contends that Ms. Park's efforts to "hold herself out" to the community as a provider of attorney referral services amounted to solicitation.

Solicitation, as that term is employed in the Act, is used in its common, ordinary meaning and not with reference to the common law crime of solicitation. *In re Appeal No. 180*, 278 Md. 443, 449, 365 A.2d 540 (1976) (defining "solicitation" for the purposes of an anti-prostitution statute by reference to its use in the Barratry Act). In *Schackow v. Medical–Legal Consulting Serv., Inc.*, 46 Md.App. 179, 193–94, 416 A.2d 1303 (1980), this Court dealt precisely with the issue of what amounted to solicitation under the Act. Although not under circumstances identical to the instant case, *Schackow* set forth what conduct *did and did not* amount to solicitation. In that case, an attorney attempted to use an alleged violation of the barratry statute as a defense to payment of a debt to a consulting company. It seems that after the client retained attorney Schackow, the attorney contacted a consulting company known for arranging expert testimony. Schackow learned of the consulting service from another attorney. The consulting company held itself out, by advertisement in various legal publications, as a provider of expert testimony consulting services. Mr. Schackow, therefore, had been retained by the client before the alleged solicitation took place. Our decision in *Schackow*, however, turned on the definition of solicitation and not the relative chronological position of the alleged solicitation. This Court held that, because the consulting company "never initiated the contact", it did not "solicit". *Id.* at 193–94, 416 A.2d 1303.

Despite the obvious difference in the linkage between the parties in *Schackow* and the instant case, i.e., *Schackow*

involved solicitation of the attorney and not the client, the definition of solicitation remains constant. "Solicitation" under the Act does not include mere advertising or "holding out to the public" information regarding lawyer referral services. More importantly, *Schackow* informs us of what solicitation *is*. Solicitation requires, at the very least, that the alleged barrator initiate direct contact with the alleged victim.

In the instant case, there was no evidence that Ms. Park initiated contact with the Sons regarding her lawyer referral services. In fact, all parties agree that Ms. Son initiated contact with Ms. Park. Ms. Park, therefore, did not violate the Act and did not commit barratry. Because she did not, the law firm and Mr. Stein did not.

Were appellees to rejoice at this juncture, it might be premature. As we have noted previously, whether appellees's actual conduct subjected them to the penalties of the Act is not directly the issue. Mr. Son brought his action based upon the existence of an illegal agreement. An agreement to act illegally could exist despite the lack of actual illegal activity on the part of appellees. Appellees' conduct might speak, however, to the existence of an illegal agreement.

### III.

The existence of a contract between Ms. Park and the law firm is a fact in dispute. Because such a contract, if it existed, was most likely oral, varying standards of construction apply. Interpretation of a written contract proceeds in two phases. A court must first determine if the contract is ambiguous. If the contract is unambiguous, then the court must determine the meaning of the contract as a matter of law. The parties are then presumed to have intended what they expressed in the language of the agreement. Their actual intent, therefore, is not considered. *E.g.*, *General Motors Acceptance Corp. v. Daniels*, 303 Md. 254, 261, 492 A.2d 1306 (1985); *McIntyre v. Guild, Inc.*, 105 Md.App. 332, 355, 659 A.2d 398 (1995); *Faw, Casson & Co. v. Everngam*, 94 Md.App. 129, 134–35, 616 A.2d 426, *cert. denied*, 330 Md. 155,

622 A.2d 1195 (1992). When a written agreement is ambiguous, a court must resort to the rules of contract construction and may also consider extrinsic evidence. Likewise, when parties disagree as to the existence or terms of an oral agreement, their conduct and intentions may be employed to determine any ambiguous and unknown provisions of the contract. *Globe Home Improvement Co. v. McCarty*, 204 Md. 513, 517, 105 A.2d 216 (1954); *Weil v. Free State Oil Co.*, 200 Md. 62, 87 A.2d 826 (1952); *Snyder v. Cearfoss*, 187 Md. 635, 51 A.2d 264 (1947).

Regarding the various contracts alleged in this case, we divine that Mr. Son alleges the existence of three. He, of course, acknowledges his written consulting agreement with Ms. Park (the "Son–Park" agreement) and his agreement to retain the law firm (the "Son–Firm" agreement). His Complaint, however, clearly alleges that the various written documents are a "thinly veiled" subterfuge. Essentially, he believes that his agreement with Ms. Park, and the two retainer agreements with the law firm and Mr. Stein, resulted from a third agreement between the law firm and Ms. Park (the "Firm–Park agreement"). The Son–Park and Son–Firm written agreements are, appellant argues, illegal not based on their own terms [13] but because they stem from the alleged illegal Firm–Park agreement. They are, he argues, the progeny of an illegal contract, the terms of which are uncertain. We shall, in subsequent sections of this opinion, address whether the Firm–Park agreement had an illegal purpose and

---

13. The terms of these two written contracts are not facially illegal, nor does appellant so claim. The first consulting agreement, executed on 12 August 1992, states that Ms. Park's fee is separate from the attorney's fee. The 11 November 1992 second embodiment of the Son–Park contract indicates that Ms. Park will not perform legal services nor share in the attorney's fee. Mr. Stein's acknowledgement of this contract is limited to a guarantee that Ms. Park's fee will be paid directly to her and not to the clients. The Son–Firm contract is an unremarkable personal injury contingent fee retainer agreement. One questionable circumstance surrounding that agreement is the existence of the two separate written manifestations executed on the same date but with different fees distinguishable only by the amount of Ms. Park's consulting fee.

whether the Son–Park and Son–Firm contracts could be infected with that illegality. In this section, however, we shall conclude that a factual dispute existed concerning the existence of the Firm–Park agreement.

 Again, we must remind ourselves that this appeal comes to us after a grant of summary judgment. Upon concluding that a material dispute of fact exists, we must reverse and remand. Mr. Son alleges the existence of an illegal Firm–Park agreement with uncertain terms. Appellees deny that such a contract existed. Contract construction or interpretation is initially a question of law for the court. *Shapiro v. Massengill,* 105 Md.App. 743, 661 A.2d 202 (1995); *McIntyre v. Guild, Inc.,* 105 Md.App. 332, 659 A.2d 398 (1995). When the existence of an oral contract is disputed, however, and, alternatively, there is conflicting evidence as to its terms, it is for the finder of fact to determine if the contract existed and what were its terms. *Globe Home Improvement Co., supra.* We conclude that Mr. Son offered sufficient evidence [14] of the existence of an oral agreement between Ms. Park and the law firm to have that issue placed before a jury. He offered, *inter alia,* the following:

—On at least one occasion prior to Mr. Son's accident, Mr. Stein had been approached by Ms. Park regarding representation of a Korean litigant. Mr. Stein corresponded directly with Ms. Park as the agent of this other Korean family.

—Ms. Park's $242,500.00 check came from the firm's escrow account. This payment was not revealed on the *pro forma* final settlement sheet. Her fee instead was embedded, and allegedly concealed, in the attorneys' fee on that document.

—Ms. Park testified that she was sent Mr. Son's settlement sheet first. After her review, Mr. Son was allowed to see the document.

---

14. Much of the testimonial evidence used by the parties was educed during depositions taken during the Sons' divorce proceeding.

—Ms. Son testified, in response to whether Ms. Park ever received a fee, "I didn't pay her, but it was between Mr. Stein the lawyer, and Jennifer [Park]."

—Ms. Son testified that Ms. Park played an active role in negotiating the fee with Mr. Stein. She stated "The lawyer asked one-third of the—whatever the recovered money—and Jennifer [Park] kind of negotiated with the lawyer to cut down the commission, or the fee of the lawyer, to 30 percent, and then later on, 28 percent. And I was told that 23 percent is going to the lawyers, and her portion is going to be five percent, from it." Ms. Son further testified that it was Mr. Stein who told her of the arrangement.

—Ms. Son, in response to a question regarding her agreement to the fee arrangement between the law firm and Ms. Park, stated "Well, that was not quite my business, because all I need to do was give them 28 percent, and whatever the commissions that Jennifer Park is getting from the lawyer is between the lawyer and Jennifer. So, it's not my business." Ms. Son, therefore, directly testified that she believed an agreement existed between Ms. Park and the law firm.

This evidence placed in dispute the fact that an oral, or undisclosed written, agreement existed between Ms. Park and the law firm. A reasonable jury could permissibly infer from such testimony that an agreement was forged between Ms. Park and the law firm. They also could decide properly that the Firm–Park agreement had as at least one of its objectives concealment from Mr. Son information regarding the funds paid to Ms. Park. Whether Mr. Son offered admissible evidence regarding the potentially illegal terms of the agreement will be discussed in the following sections of this opinion.

## IV.

 Demonstrating a factual dispute concerning the existence of a Firm–Park agreement is only the first hurdle Mr. Son had to clear. He must also have generated a genuine factual dispute regarding the illegality of that contract. If

that illegality was not placed in dispute, then the contract cannot be voided. Certainly, Mr. Son alleged that the contract between Ms. Park and the law firm was illegal, and, of course, appellees deny that illegality. We conclude that Mr. Son did not demonstrate facts sufficient to survive summary judgment concerning the contract's illegality stemming from a barratrous purpose.

As a general rule, parties are free to contract as they wish. *State Farm Mut. Auto. Ins. Co. v. Nationwide Mut. Ins. Co.*, 307 Md. 631, 643, 516 A.2d 586 (1986); *Gardiner v. Gardiner*, 200 Md. 233, 88 A.2d 481 (1952). There is a substantial public interest in allowing individuals and corporations to structure their own affairs for their own benefit and at their own risk. *See Bausch & Lomb, Inc. v. Utica Ins. Co.*, 330 Md. 758, 790, 625 A.2d 1021 (1993); *Finci v. American Cas. Co.*, 323 Md. 358, 378–79, 593 A.2d 1069 (1991); *Maryland–Nat'l Capital Park and Planning Comm'n v. Washington Nat'l Arena*, 282 Md. 588, 606, 386 A.2d 1216 (1978). A contract that violates public policy as stated in a statute, however, is invalid, but only to the extent of the conflict between the contract and the policy so stated. *State Farm Mut. Auto. Ins. Co.*, 307 Md. at 643, 516 A.2d 586; *Insurance Comm'r v. Metropolitan Life Ins. Co.*, 296 Md. 334, 340 n. 6, 463 A.2d 793, 796 (1983).

As we have previously determined, Ms. Park and the law firm did not actually commit barratry. They possibly did commit, however, all of the necessary elements except solicitation. Ms. Park's actions were otherwise consistent with those of a barrator and someone who had contracted illegally with the law firm to commit barratry. Mr. Son, however, offered no evidence that a Firm–Park agreement contemplated solicitation. That contract could only be voided on barratrous grounds if Mr. Son offered some proof that the law firm and Ms. Park contracted for the purpose of committing barratry. Because he did not place into dispute that the contract had "solicitation" as one of its purposes, Mr. Son did not meet his burden.

## V.

As we previously indicated, the parties focused their attention on the allegedly barratrous nature of the Firm–Park agreement. We discern that Mr. Son's contract also implies certain violations of the Rules of Professional Conduct governing lawyers. Mr. Son's claim, that his contracts with the law firm and Ms. Park are void based upon an illegal fee-splitting or paid referral agreement, is not affected by his failure to demonstrate a barratrous contract. As we previously demonstrated in Section III of this opinion, Mr. Son offered sufficient evidence to place the existence of a Firm–Park agreement in dispute. He must, of course, also place into dispute that the object of that agreement was against public policy. Md.R.Prof.Conduct 5.4 requires that "a lawyer or law firm not share fees with a nonlawyer...." Md.R.Prof.Conduct 7.2(c) provides that "a lawyer shall not give anything of value to a person for recommending the lawyer's services." Mr. Son has firmly placed into dispute that the Firm–Park contract contemplated violation of these Rules. We conclude, however, that the Rules of Professional Conduct are not statements of public policy on which an illegal contract claim may be founded. We explain.

Again, a contract that violates public policy as stated in a statute is void. *See Finci,* 323 Md. at 378, 593 A.2d 1069; *State Farm Mut. Auto. Ins. Co.,* 307 Md. at 643, 516 A.2d 586; *Insurance Comm'r,* 296 Md. at 340 n. 6, 463 A.2d 793. Mr. Son alleged that the public policy violated by the Firm–Park contract proscribes fee-splitting and paid referrals by attorneys. This prohibition, however, is found not in a statute, but in the Rules of Professional Conduct.

The Rules of Professional Conduct were adopted by the Court of Appeals, pursuant to its 15 April 1986 Order, to "govern the conduct of attorneys". The Court's power to so regulate stems from Md. Const. art. IV, § 18(a).[15] It is

---

**15.** This State's Constitution provides that:

established that the Rules of Procedure are legislative in nature within the scope of the constitutional authority granted the Court of Appeals. *Ginnavan v. Silverstone,* 246 Md. 500, 504, 505, 229 A.2d 124 (1967); *Kohr v. State,* 40 Md.App. 92, 96–97, 388 A.2d 1242 (1978). As long as those rules do not otherwise violate the Federal or State Constitutions, the rules take on a legislative quality.

The record contains evidence that Ms. Park and the law firm entered into an agreement, the subject of which may have violated the Maryland Rules of Professional Conduct.[16] Despite this evidence, we conclude that the Rules of Professional Conduct are not a source of public policy that may be employed to void contracts. Our decision flows from our recent holding in *Post v. Bregman,* 112 Md.App. 738, 686 A.2d 665 (1996) that requires us "not to abuse [the judiciary's] autonomy by extending the application of the rules it promulgates

---

The Court of Appeals from time to time shall adopt the rules and regulations concerning the practice and procedure in and the administration of the ... courts of this State, which shall have the force of law ...
Md. Const. art. IV, § 18(a).

**16.** We need look no further than the testimony and facts detailed in Section III of this opinion to find this evidence. Appellees' conduct before, during, and after Mr. Son's representation by the law firm was consistent with a fee-splitting and paid referral contract. A reasonable fact finder could infer that Ms. Park and the law firm had a standing contract, the terms of which provided her compensation for referrals through shared attorney's fees. Such a contract anticipates violation of the Maryland Rules of Professional Conduct with or without the solicitation required by the Barratry Act.

Such an inference is supported by evidence from which a fact finder could conclude that appellees attempted to conceal the specifics of their arrangements from Mr. Son and the trial court. A reasonable jury could decide that a law firm that maintains two separate retainer agreements, with fee recovery percentages corresponding exactly to Ms. Park's consulting fees, was acting consistent with a fee-splitting or paid referral purpose. That jury reasonably could reject appellees' contention that the second contingency fee agreement was simply the product of negotiation as wholly unbelievable. We also note the failure of the law firm to completely disclose in the settlement sheet the fees paid to Ms. Park. This may speak to a consciousness of guilt that could denigrate appellees' credibility before a jury.

into areas not within its primary authority." *Post*, at 762, 686 A.2d at 676.

In *Post*, we considered whether the Rules of Professional Conduct supplied implied terms to a fee-splitting contract between attorneys. It has been a well settled principle of contract law that the parties to a contract are presumed to know the law. The laws effective at the time a contract is formed become a part of it as if they were expressly referred to or incorporated in the contract's terms. *Post*, at 757–58, 686 A.2d at 674; *see Wilmington Trust Co. v. Clark*, 289 Md. 313, 320, 424 A.2d 744 (1981); *Heyda v. Heyda*, 94 Md.App. 91, 98, 615 A.2d 1218 (1992); *Shell Oil v. Ryckman*, 43 Md.App. 1, 8–9, 403 A.2d 379 (1979). This rule of contract construction, first articulated in *Von Hoffman v. Quincy*, 71 U.S. (4 Wall.) 535, 550, 18 L.Ed. 403 (1866), does not incorporate the Rules of Professional Conduct. *Post*, at 762, 686 A.2d at 676. As in *Post*, we considered the text of the introductory note on the scope of the Rules of Professional Conduct. The language used in that note is, as it was in *Post*, directly on point. It clearly dictates that "nothing in the Rules should be deemed to augment any substantive legal duty of lawyers or the extra-disciplinary consequences of violating such a duty." By allowing Mr. Son to void his contracts with appellees posited on an asserted violation of those Rules, we would be so augmenting the consequences of violating the Rules. In *Post*, we decided the Rules did not supply implied terms to a contract. In the instant case, we conclude that violation of the Rules do not provide a basis for voidance of a contract. If the Rules of Professional Conduct are ineffective in providing implied terms, then they are not robust enough to void a contract. Based on this analysis and that contained in the previous section of this opinion, we shall affirm the trial court's summary judgment regarding the contract voidance count (Count I).

## VI.

Mr. Son also brought actual fraud, constructive fraud, negligence, and conspiracy claims against the law firm and

Mr. Stein. He included Ms. Park as a defendant in the conspiracy count. Mr. Son based these actions on the alleged misrepresentations by appellees. As discussed in the preface to our analysis, we shall limit our review to those issues raised by the parties' motions for summary judgment. The law firm and Mr. Stein, at least partially, based their motion for summary judgment on Mr. Son's actual or constructive knowledge of the agreement.[17] Without deciding if knowledge of the agreement would ever mandate summary judgement on these causes of action, we decide that summary judgment could not be properly based on Mr. Son's knowledge of the Firm–Park agreement. We explain.

We need not consider whether Mr. Son had actual knowledge of the Firm–Park agreement as it was not raised below by the law firm and Mr. Stein. Their motion for summary judgment raised only the issue of constructive knowledge. The law firm and Mr. Stein argue that Ms. Son was appointed her husband's attorney-in-fact pursuant to the 22 September 1992 General Power of Attorney. *See* note 3, *supra.* Her knowledge of the agreement, appellees contend, is imputed to Mr. Son. Mr. Son responded that he lacked the capacity to appoint Ms. Son, and, therefore, the power of attorney was invalid. We conclude that the validity of the power of attorney is a material fact in dispute. Because it is disputed, it could not be the basis for summary judgment. Mr. Son's actual or constructive knowledge of the Firm–Park agreement could not have been a proper foundation for the grant of summary judgment on the remaining counts (Counts II–V).

## VII.

Appellees' final avenue of attack below was paved with the contention that the lack of a barratry violation entitles appellees to judgment as a matter of law. We decided in section II

---

17. Ms. Park's summary judgment motion did not raise the issue of Mr. Son's actual or constructive knowledge. Because she attempts to raise the issue for the first time on appeal, we need not consider the issue as far as it concerns her. Rule 8–131(a).

of this opinion that no violation of the barratry statute was demonstrated in this case. We similarly decided in section III that the question of whether the Firm–Park agreement contemplated deception or purposeful omissions was an issue that properly could reach a jury. We must, therefore, analyze each cause of action to determine if the lack of a barratry violation so entitles appellees to the judgment they received.

Mr. Son's negligence claim against the law firm and Mr. Stein is the easiest to diagnose. Appellees, we presume, claim that because they did not violate the barratry statute, they did not breach a duty owed to Mr. Son. Of course, to recover for negligence, Mr. Son must prove the existence of a duty owed to him, the breach of that duty, a causal connection between the breach and injury, and damages. *E.g., Baltimore Gas and Elec. Co. v. Lane,* 338 Md. 34, 656 A.2d 307 (1995); *Southland Corp. v. Griffith,* 332 Md. 704, 633 A.2d 84 (1993). Appellees essentially argue that Mr. Son predicated his claim on a duty created by the Barratry Act. Without a violation, they argue, there was no breach and, therefore, they were entitled to judgment as a matter of law.

Mr. Son's negligence count sets forth that Mr. Stein and the law firm breached a duty to advise Mr. Son that their services had been procured by Ms. Park in exchange for their promise to pay a referral fee. Mr. Son did not specifically plead a duty based upon the Barratry Act[18]. He instead claimed that his lawyer owed him a duty to inform him of, and at the very least not misrepresent, the terms of the agreement with Ms. Park. The lack of a barratry violation does not affect the viability of a negligence claim based upon such a duty. We cannot, therefore, affirm the grant of summary judgment on that basis.

Mr. Son's fraud count is similarly revived. The elements of fraud are: (1) a false representation was made by the defendant to the plaintiff; (2) that falsity was known or the

---

18. We do not decide whether violation of the Barratry Act amounts to evidence of negligence in this case or any other.

misrepresentation was made with reckless indifference to the truth; (3) the misrepresentation was made for the purpose of defrauding the plaintiff; (4) the plaintiff rightfully relied upon the misrepresentation; and (5) the plaintiff suffered actual damages resulting from the misrepresentation. *E.g., Alleco Inc. v. Harry & Jeanette Weinberg Found., Inc.*, 340 Md. 176, 665 A.2d 1038 (1995); *Martens Chevrolet, Inc. v. Seney*, 292 Md. 328, 439 A.2d 534 (1982).

Mr. Son alleged that Mr. Stein and the law firm misrepresented the terms of their agreement with Ms. Park and misrepresented the disbursements made on Mr. Son's behalf. It is on these acts, and not a violation of the Barratry Act, that Mr. Son perched his fraud claim. The lack of barratrous activity, therefore, did not entitle appellees to judgment as a matter of law on that count.

Mr. Son also brought a constructive fraud claim. Constructive fraud is defined as "a breach of a legal or equitable duty which, irrespective of the moral guilt of the fraud feasor, the law declares fraudulent because of its tendency to deceive others, to violate public or private confidence, or to injure public interests. Neither actual dishonesty of purpose nor intent to deceive is an essential element of constructive fraud." *Scheve v. McPherson*, 44 Md.App. 398, 406, 408 A.2d 1071 (1979). Constructive fraud is nonetheless fraud. *Id.* Therefore, the elements of fraud not resting on intent or dishonesty remain essential. Appellees did not attack these other elements, however. They merely asserted that the lack of a barratry violation dictates that judgment should be granted in their favor on the constructive fraud claim as a matter of law.

Mr. Son's constructive fraud count asserts that Mr. Stein and the law firm "tended to deceive the Plaintiff because: (a) they violated the confidence reposed in [Mr. Stein and the law firm]; and (b) they are violative of the public interest as codified in the [Barratry Act]." The second prong of his claim is founded upon the Barratry Act and is, in light of the lack of a violation, defeated. The first basis for his claim, i.e., the

violation of the confidence Mr. Son placed in his lawyers, remains viable. Without deciding whether the attorneys' alleged failure to disclose amounts to constructive fraud, we conclude that the lack of a barratry violation did not mandate entry of judgment on that count. As this was the basis asserted by appellees in their motions below, this also limits our analysis.

 Finally, we consider Mr. Son's civil conspiracy count. Appellant alleged that appellees and Ms. Son conspired to pay a fee to Ms. Park pursuant to an illegal fee agreement and to conceal that agreement from Mr. Son. Civil conspiracy is not recognized in Maryland as an independent cause of action. *See Alexander & Alexander, Inc. v. Evander & Associates, Inc.*, 336 Md. 635, 645 n. 8, 650 A.2d 260 (1994); *Van Royen v. Lacey*, 262 Md. 94, 97–98, 277 A.2d 13 (1971). One alleging such a claim must demonstrate some other unlawful or tortious activity. Thus, in order to state a claim for civil conspiracy, a plaintiff must show: (1) an agreement or understanding between two or more persons; (2) some unlawful or tortious act done in furtherance of the conspiracy or use of unlawful or tortious means to accomplish an act not itself illegal; and (3) actual legal damage to the plaintiff. *Van Royen*, 262 Md. at 98, 277 A.2d 13. Appellees focus their attention on the second prong of this cause of action, maintaining that the failure of Mr. Son's "barratry claim" removes the requisite unlawful act.

We have concluded that Mr. Son's negligence and fraud-based claims against Mr. Stein and the law firm remain viable. We further conclude that these tortious acts, if proven, might satisfy the second element of a civil conspiracy claim. We acknowledge that because there was no barratry violation in the instant case, that claim may not be used to satisfy this element. The other torts alleged by Mr. Son, however, may. We determine, therefore, that summary judgment was im-

**224**

proper in this regard as to all appellees.[19]

In sum, we shall affirm the judgment with regard to Mr. Son's void contract claim (Count I) and reverse the judgement on all other counts.

JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION; COSTS TO BE PAID 25% BY APPELLANT, 25% BY APPELLEE PARK; 25% BY APPELLEE STEIN, AND 25% BY APPELLEES MARGOLIUS, MALLIOS, DAVIS, RIDER & TOMAR.

---

19. We acknowledge that the negligence and fraud-based tortious claims possibly supporting the civil conspiracy count were brought, as independent claims, only against Mr. Stein and the law firm. Nonetheless, the civil conspiracy count against Ms. Park remains alive and well. We conclude "that the party wronged may look beyond the actual participants in committing the injury, and join with them all defendants who conspired to commit it...." *Robertson v. Parks*, 76 Md. 118, 135, 24 A. 411 (1892) (*cited in Alexander & Alexander, Inc. v. Evander & Associates, Inc.*, 336 Md. 635, 645 n. 8, 650 A.2d 260 (1994)). In fact, this is the most substantial advantage of framing a cause of action of civil conspiracy. If Ms. Park participated in the conspiracy, she may be liable for the lawyers' tortious conduct. This is so despite Mr. Son's failure to name Ms. Park as a defendant in those other counts.